IRVIN J. BUSSING AND ELIZABETH B. BUSSING, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 42550-84.    Filed November 24, 1987.

*Richard L. Gold,* for the petitioners.*
*Roland Barral* and *Jill A. Frisch,* for the respondent.

## SUPPLEMENTAL OPINION

WILLIAMS, *Judge:* This case is before the Court on petitioners' motion for reconsideration of the Court's opinion pursuant to Rule 161, Tax Court Rules of Practice and Procedure. The Court's opinion in this case, reported at 88 T.C. 449 (1987), was filed on February 23, 1987. Petitioners' motion was timely filed on April 10, 1987.[1]

Petitioners ask that the Court reconsider our findings of fact and conclusions of law with respect to the following issues: (1) The function and role of Sutton Capital Corp. in the purchase and lease transaction at issue in this case; (2) the character of a note, for Federal income tax purposes, executed by petitioner Irvin J. Bussing (Bussing) in favor of Sutton Capital Corp.; and (3) the nature of the relationship among Bussing, CIG Computers, AG (AG), and the other investors who held interests in the computer equipment that was the subject of the transaction at issue.

In 1979, AG purchased from and leased back to Continentale Allgemeine Versicherungs-AG (Continentale), a Swiss corporation, certain IBM computer equipment (the equipment) in an arm's-length transaction. On December 7, 1979, the fair market value of the equipment was $1,175,340.[2] On December 7, 1979, the equipment was

---

*The Court permitted the Computer Dealers and Lessors Association to file briefs as amicus curiae in support of petitioners' motion.

[1] The Court granted petitioners' timely motion to enlarge the time in which to move for reconsideration.

[2] In the opinion at note 3, 88 T.C. at 451, we inadvertently inverted the ratio of Swiss Francs to the U.S. dollar. The currency exchange rate was .6460 U.S. dollars to the Swiss Franc on Oct. 1, 1979, and .6186 U.S. dollars to the Swiss Franc on Dec. 7, 1979. We have editorially corrected the reported opinion for the bound volume. The calculations as stated at note 3, and the accompanying text correctly reflect the proper exchange rates.

purportedly transferred from AG to Sutton Capital Corp. (Sutton).[3] At this same closing Bussing acquired, purportedly from Sutton, a 22.2-percent interest in the equipment.[4] For his interest in the equipment, Bussing agreed to pay $244,444. Four other investors acquired similar interests in the equipment. The equipment was encumbered by the lease between AG and Continentale, and a security interest was held by Handelsbank N.W., a third-party lender through which AG had financed its purchase of the equipment from Continentale. As part of the same transaction and at the same closing, Bussing executed a net-net-net lease of his interest in the equipment to AG. Bussing also executed a marketing agreement with AG designating AG as his agent to remarket the equipment.

Bussing paid $41,556 in cash and short-term promissory notes in favor of Sutton for his interest in the equipment. Bussing paid one short-term promissory note in June of 1980 to Sutton, and paid the other short-term note in January of 1981 to the Hancock Capital Corp. Bussing financed the balance of the purchase price by executing a long-term, partially recourse note in the amount of $202,888 in favor of Sutton.

The rent due Bussing from his lease with AG equaled Bussing's obligations due on his note to Sutton for the first 3 years of the lease. The transaction was then supposed to generate, for Bussing, a cash-flow of $533 per year from the lease with AG net of his payments due on his obligation to Sutton. As we found, 88 T.C. at 453, "Bussing's annual payments on his obligation to Sutton were financed by his annual rent from AG." This was the form of the transaction from Bussing's perspective. Petitioners, however, offered no evidence of AG's payments of rent as debt service to Sutton (or any other entity). Moreover, Bussing received no cash-flow from the transaction.[5]

---

[3]No documents of transfer to Sutton are in evidence. Counsel's corporate law opinion states that "in connection with the transfers which took place on [Dec. 7, 1979] the date [of the opinion,]" AG "transferred to Sutton and Sutton then resold to" the investors, the equipment.

[4]Defined terms have the meanings ascribed in our opinion of Feb. 23, 1987.

[5]Bussing reported $1,223 on his Federal income tax return for his 1981 taxable year as "other income." However, at trial, Bussing indicated that the payment was made to him by Computer Investors Group, Inc. (CIG) the parent of AG and guarantor of AG's lease payments, in error. Bussing recorded the payment as "unexpected cash-flow" from CIG in his notes attached to a financial spread sheet prepared by CIG for Bussing. We treated this payment as Bussing did—as serendipity.

In the opinion, we disregarded Sutton's participation in the transaction. We also disregarded Bussing's $202,888 long-term partially recourse promissory note to Sutton. We found, nevertheless, that Bussing's transaction with AG had some economic substance, though not in the form it was cast. We found that Bussing acquired his interest in the equipment, not as a tenant-in-common in the equipment, but as a joint venturer with AG and the other four investors. Consequently, we held that Bussing was entitled to deduct his distributive share of the losses of the joint venture, subject to the partnership loss provisions of section 704(d),[6] and the limitations of section 465.

Petitioners contend that, except for finding economic substance to the transaction, we erred in these findings of fact and conclusions of law. Respondent agrees with our findings and conclusions and opposes petitioners' motion in its entirety.

## The Function and Role of Sutton

Petitioners contend that the Court erred in disregarding the role of Sutton in the transaction at issue. Petitioners argue first that they made a prima facie showing that Sutton acquired title to the equipment from AG prior to its selling an interest in the equipment to Bussing, and that absent contrary evidence by respondent, the Court must find for petitioners on this issue. Petitioners would have us hold that the substance of the transaction involving Bussing, AG, and Sutton was for Federal tax purposes identical to that between AG, Continentale, and Handelsbank.[7] We disagree.

Sutton's participation in the transaction was transitory, and petitioner's evidence of Sutton's ownership fell far short of carrying his burden of proof. No documents establishing transfer of ownership of the equipment from AG to Sutton are in evidence. Sutton's president, who participated in closing the AG-Sutton-Bussing-AG transaction at issue, had no recollection of any details of the transaction with

---

[6]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, unless otherwise indicated.

[7]The transaction between AG, Continentale, and Handelsbank is diagramed at 88 T.C. at 456. Respondent conceded its bonafides.

Bussing, or knowledge of the effect of the transaction on Sutton's purported interest in the equipment. The statement by Sutton's president that Sutton engaged in the transaction "to earn money" is not a complete enough answer to give substance to Sutton's ownership in the equipment for Federal tax purposes. Sutton's president perceived Sutton's role solely to be that of a middleman required to qualify the transaction for Federal tax purposes. Bussing himself testified that he believed he acquired his interest in the equipment from AG. We believe that Sutton intended "to earn money" as a straw man and, in fact, did not realize any proceeds from the transaction as an owner of the equipment.

Petitioners rely solely on a standard corporate law opinion to establish that ownership had been transferred from AG to Sutton. Petitioners' counsel refer to this opinion as a "title" opinion. It is not, however, a title opinion as to Sutton. This document, moreover, fails to identify any documents evidencing a transfer of title of the equipment from AG to Sutton, or to discuss any of the terms of the purported transfer from AG to Sutton. The opinion notes that interests in the equipment were "transferred" to Sutton in the same closing in which they were "transferred to Bussing." The opinion expresses the view that "Title to the equipment was duly transferred to [Bussing] free and clear." It expresses no view on Sutton's ownership interests. This opinion was not intended to express a view on ownership for Federal income tax purposes. It is pure sophistry to argue otherwise.

Neither do we find the tax opinion rendered by petitioners' counsel persuasive. This opinion states, "We have been advised that it is your intention to treat this transaction as a purchase and lease. On the assumption that this transaction would be properly characterized as a sale of an undivided interest in the equipment by Sutton to you." Moreover, the opinion notes, it was given "without any independent investigation of the facts." While counsel can render opinions on assumptions, we cannot.

Petitioners also attack the Court's conclusion at 88 T.C. at 458 that "after closing, Sutton disappeared entirely from the transaction," pointing to the payments that Bussing

made on his short-term note to Sutton and to Hancock Capital Corp., to which Bussing made a payment by check in January of 1981.[8] Petitioners have attacked this finding by applying it out of context. Our conclusion was drawn in the context of our discussion of Bussing's long-term note to Sutton and the offsetting rental payments. After Bussing's two payments on the short-term promissory notes, there is no evidence of further interest or participation in the transaction by Sutton. Specifically, the record is devoid of evidence to suggest that Bussing's long-term note was, as petitioners contend, transferred to the Hancock Capital Corp. (an entity not identified by the evidence). Further, the evidence in this case does not show that any debt service on the long-term note was ever paid. As to Bussing, the rent and debt services may have been offsetting obligations, but if the note were real, AG would have paid the rent as debt service to the note holder. Petitioners failed to prove that any payments were ever made on the long-term note to Sutton, to Hancock Capital Corp., or to anyone. As Sutton's president testified, Sutton was inserted into the transaction solely to make the transaction appear as a multiple-party transaction for Federal tax purposes. We reaffirm, therefore, that Sutton's blink-of-an-eye interest in the transaction must be disregarded.

Petitioners further argue that Sutton's role is that of a third-party lender, and that this case is therefore indistinguishable from *Mukerji v. Commissioner*, 87 T.C. 926 (1986). In *Mukerji,* the Court determined, among other things, that the purchaser's indebtedness was to a genuine third-party lender, independent of the party to whom the computer equipment at issue in that case was leased. The Court found there to be substantial certainty that the purchaser's obligation to the lender, which was offset by rent due the purchaser from its lessee, would be paid. See *Mukerji v. Commissioner,* 87 T.C. 926, 968 (1986). In this case, however, we have no certainty that any payment on the debt would be (or was ever) paid. The evidence reflects no action by any party to enforce its purported rights pursuant

---

[8]The evidence does not identify Hancock Capital Corp., and there is no explanation in evidence of the role of Hancock Capital Corp., or of the reason Bussing made payments to it on the short-term note.

to the form of the transaction. To the contrary, the evidence shows that Sutton merely collected a fee for its participation as a straw man. Sutton's participation in the transaction was motivated solely by petitioners' desire to make the transaction appear as a genuine multiple-party transaction for Federal income tax purposes. See *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978).[9]

### Bussing's Long-Term Note to Sutton

Petitioners properly recognize that our disregarding Sutton is intertwined with our determination that the long-term note from Bussing to Sutton in the principal amount of $202,888 does not represent valid indebtedness for Federal tax purposes. Petitioners argue that payments on Bussing's note to Sutton were made through rent payments from AG, which petitioners imply flowed directly to Sutton.

AG's obligations to Bussing pursuant to its lease matched, on paper, Bussing's obligations to Sutton pursuant to his long-term note for the first 3 years of the lease. They exceeded Bussing's obligations by an amount of $533 per year for the remainder of the lease term. The parties to the debt and the lease, however, ignored both the form of the debt obligations of Bussing to Sutton, and the lease payments due from AG to Bussing. Bussing neither received lease payments from AG nor made payments to Sutton on his note. Furthermore, as discussed above, there is no evidence in this case that AG paid the note to Sutton (or anyone) in lieu of direct rent to Bussing. The record is barren of evidence that any rent was paid or that any debt payments on Bussing's long-term obligation were made.

---

[9]Petitioner also argues that this case is indistinguishable from *Gefen v. Commissioner*, 87 T.C. 1471 (1986). Again, we are compelled to disagree. In *Gefen*, the Court determined that the taxpayer invested in a limited partnership that purchased and leased computer equipment in a genuine multiple-party transaction. The taxpayer in *Gefen* contributed cash to the partnership and executed a guaranty for her proportionate share of the recourse obligations of the partnership. The partnership, in turn, purchased certain computer equipment which was financed through a third-party lender, and leased the equipment to another party. We determined in *Gefen* that the terms of the transaction at issue reflected arm's-length negotiation, and that the activity of the parties demonstrated that the substance of the transaction matched its form. In this case, however, the parties' actions did not comport with the form of the transaction. No lease payments were made by AG, and no note payments were made by Bussing. The record demonstrates that Sutton's participation was merely an attempt to qualify the transaction for Federal tax purposes. Petitioners have failed to establish that the parties respected the form of the transaction.

Petitioners contend that the matching of lease payments to debt obligations to produce zero cash-flow is, without more, a neutral factor in considering the substance of a given transaction. The matching of rent to debt obligations, and the absence of cash-flow is in some cases regarded as a neutral factor. It is regarded as a neutral factor if the debt is paid out of rent. See *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985); *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982), cert. denied 459 U.S. 907 (1982). In this case, however, there is no evidence that the debt was paid. Moreover, the form of the transaction did not match AG's lease payments to Bussing's payments due, but was supposed to produce a positive cash-flow to Bussing after 3 years. Bussing received none of the cash-flow to which he was purportedly entitled. No rent was paid on the lease. The debt was not amortized. Accordingly, we believe that offsetting lease "payments" with debt service "payments" is not a neutral factor in this case. The transaction in form did not comport with its operation and effect in substance. AG was in effect the note holder, not having paid rent or serviced debt.[10]

Bussing's principal obligation under his note to Sutton would be deferred until 1991 in the event of a default by AG. Petitioners dispute our determination that this feature indicates the transaction between Bussing, AG, and Sutton was not negotiated at arm's length. Considered in the context of the lack of substance of Sutton's role and the parties' disregard of the form of the transaction, the existence of the deferral provision reinforces our conclusion that Bussing's indebtedness to Sutton is without substance.

Petitioners also argue that we cannot disregard this note, because we found Bussing to be personally liable for $90,000 of the debt. To the extent Bussing was personally liable for $90,000, however, he was liable to AG in the course of their common activity of renting the equipment. Compare *Abramson v. Commissioner*, 86 T.C. 360 (1986). The note had no independent significance, and Bussing owed none of it to Sutton. If rent were insufficient to meet

---

[10]The evidence, moreover, does not support a finding that AG could find a third-party, unrelated financial institution that would purchase Bussing's note if AG became financially strapped. Such a showing would have helped in establishing the reality of the obligation.

debt service, we believe payment, if any, would be made to AG. Moreover, AG's parent corporation, Computer Investors Group, Inc., guaranteed AG's rental payments under the "lease." The rental payments, as discussed above, were equivalent to the debt service payments on the note. It is, therefore, unclear what amount of his personal liability Bussing would ever be called upon to satisfy.

Petitioners further contend that the long-term note is an enforceable debt to Sutton because it was viewed as such by Bussing. First, the testimony does not show that Bussing viewed his obligation as a debt owed to Sutton. Second, Bussing's view, while important, is only half the equation. The purported lender—Sutton—must intend to enforce the note. There is not the slightest evidence in the record of Sutton's, or any third party's, intending to enforce the terms of Bussing's long-term note. In sum, we are compelled to conclude that Sutton had no interest in Bussing's long-term note, which does not represent valid indebtedness for Federal income tax purposes.

### The Interest Acquired by Bussing

Petitioners contend that Bussing acquired an interest in the equipment as a cotenant with the other investors, and that AG was merely their agent. Petitioners also argue that neither they nor respondent took the position that Bussing acquired his interest in the equipment in joint venture with AG and the other investors, and imply that therefore the Court's determination was improper. It is for the Court, however, to determine for Federal income tax purposes the elements of a transaction whose substance fails to represent its form. See *Marcus v. Commissioner,* 22 T.C. 824, 832 (1954); cf. *Concord Consumers Housing Cooperative v. Commissioner,* 89 T.C. 105, 125 (1987) (Körner, J. concurring).

In our opinion, we found that the transaction Bussing entered into had economic substance. This finding, however, does not necessarily imply that the transaction, in substance, agrees with the form in which it is cast or that each part of the transaction is genuine. Having disregarded the participation of Sutton in the transaction, and concluded that Bussing's note does not represent valid indebtedness

for Federal tax purposes, we had to reexamine the substance of the purported purchase by Bussing of a 22.2-percent-ownership interest in the equipment and the lease of his interest in the equipment to AG.[11]

It would appear that seller-financed sale-leasebacks are particularly susceptible of departures from economic reality if the reserved rent and debt service obligations in a two-party transaction are offsetting. If rent and debt service are offsetting obligations, the difference between the two will always be constant, regardless of the magnitude of the offsetting obligations, and the selling price and reserved rent can be almost any large number, limited only by the usefulness of the tax benefits transferred. In this case, however, the purchase price was not artificially inflated. Accordingly, we found that Bussing acquired an economic interest in the equipment. Nevertheless, Bussing's economic (as opposed to tax benefit) return is dependent *solely* on the residual value of the equipment. That value is dependent on the market conditions prevailing at the end of the lease and, perhaps, just as importantly, on the efforts and skill required to remarket the equipment.

This two-party transaction is conceptually different from a typical multiple-party sale-leaseback in two respects: first, in a multiple-party sale-leaseback the purchaser is obligated to an unrelated third-party lender, regardless of whether rent is paid, and the purchaser receives the present economic benefit of a real payment of rent in order to make a real economic outlay of a debt service payment. The channelling of the rent directly to the lender in a multiparty transaction is a matter of convenience, and it does not derogate the economic significance of either the rent payment or the debt service payment. Each is real. If rent and debt service offset each other in a two-party sale-leaseback, however, the obligations appear on paper only. In this case, not only did the two cancel each other, the minimal positive cash-flow that should have been paid was ignored by the parties. We believe that this evidence speaks clearly about Bussing's and AG's view of the form of the transaction.

---

[11]Amicus curiae asks us to elucidate the circumstances under which a seller-financed sale and leaseback will be recognized for Federal income tax purposes. We do not decide cases other than the ones before us. In this case the sale-leaseback was a paper shuffle. As discussed *infra*, Bussing acquired his interest in the equipment as a joint venturer with AG.

Second, if as in this case, the seller-lessee retains an economic interest in current[12] and additional rent as well as in residual value, what Bussing paid for seems to be a *shared* economic interest in the equipment. Although this shared economic interest does not neatly fall into any category, it falls well within the Federal income tax definition of a partnership and lacks the chief characteristic of a tenancy-in-common: viz, the ability to encumber, alienate, improve, and change the property owned without constraint of other owners—by partitioning the property, if necessary. For the reasons discussed below, we conclude that for Federal income tax purposes the substance of the interest acquired by Bussing is that of a joint venturer with AG and the other investors.

Respondent's regulations state the term "partnership" for Federal tax purposes "includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on." Sec. 1.761-1(a), Income Tax Regs. Respondent's regulations also state:

Mere co-ownership of property which is maintained, kept in repair, and rented or leased does not constitute a partnership. For example, if an individual owner, or tenants in common, of farm property lease it to a farmer for a cash rental or a share of the crops, they do not *necessarily* create a partnership thereby. Tenants in common, however, may be partners if they actively carry on a trade, business, financial operation or venture and divide the profits thereof. For example, a partnership exists if co-owners of an apartment building lease space and in addition provide services to the occupants either directly or through an agent. * * * [Emphasis added.]

One principle enunciated by this regulation is that the level of business activity conducted by the parties can distinguish a partnership from a cotenancy. Another important principle is whether the parties are required to deal with each other to realize the economic benefits from the property.[13] See *Magneson v. Commissioner,* 753 F.2d 1490,

---

[12]The equipment remains subject to the underlying lease between AG and Continentale, and the underlying debt that AG owes. AG retains, therefore, a significant economic interest in current rent. Bussing's interest is subordinate to that debt.

[13]State law, while not binding, is of interest; California law provides that a cotenant may use and enjoy the entire property as if he were the sole owner, subject to each cotenant's exercise of the same right. *Zaslow v. Kroenert,* 29 Cal. 541, 176 P.2d 1 (1946); Cal. Civ. Code secs. 682, 685 (West 1982). An ownership interest, as a partner, is a modified cotenancy

1495 (9th Cir. 1985) (interpreting California law), affg. 81 T.C. 767 (1983). We believe the evidence establishes that Bussing's economic benefits from his interest in the equipment were derivative of, and limited by, his relationship to AG and the other investors. His ability to lease, sell, or encumber the equipment, even after the AG-Continentale lease ends, is buffered by AG, and subject to agreements with AG and the other investors. The only interest that Bussing might be able to alienate for his personal purposes is his percentage of the shared interest held by him, AG, and the other investors.

While it is not explicit in Bussing's agreements, the agreements between AG and each of the investors in the equipment required the investors in the equipment to act in concert, and AG was designated as their "agent" to facilitate such action. The terms of the lease, security, and marketing agreements executed by Bussing and AG (and other investors) establish that Bussing could not sell or lease the equipment nor encumber it in any way without the consent of the other parties to the venture.

Petitioners dispute the Court's finding that AG was the "exclusive" agent to remarket the equipment for Bussing. We adhere to our original conclusion. The marketing agreement explicitly appoints AG as marketing agent for the equipment. AG managed the lease of the equipment to Continentale and was responsible for the day-to-day marketing decisions with respect to the equipment. AG was allowed to sublease the equipment. Neither the investors, individually, nor any agent other than AG could manage or market the equipment. Petitioners failed to prove the existence or availability of competitors willing to market the equipment, or even that Bussing would have the right to appoint any other marketing agent. Thus, AG was the exclusive marketing agent for the equipment.

As a practical matter, the equipment could not be partitioned by Bussing or any other investor. As marketing

interest. Cal. Corp. Code sec. 15025(1) (West 1982). A partner can possess or use the property only for partnership purposes. Cal. Corp. Code sec. 15025 (2)(a) (West 1982). Bussing's right to possess or use the equipment is limited by all the agreements to which it is subject, and taken together, his use, possession or derivation of any economic benefit from the equipment appears to be constrained to use, possession, lease, or sale for the purposes expressed in those agreements jointly undertaken by AG, Bussing, and the other investors.

agent, AG warranted that the other investors had executed identical agreements. The equipment had to remain in place and since all of the lease and debt obligations turned on the underlying lease and debt obligations, no investor (pursuant to the security agreement) could encumber the equipment. Moreover, the investors acted in concert with AG as conductor in a complex, long-term transaction to finance, lease, sublease, and remarket the equipment. See sec. 1.761-1(a), Income Tax Regs.; compare *Estate of Appleby v. Commissioner*, 41 B.T.A. 18 (1940), affd. 123 F.2d 700 (2d Cir. 1941); *Powell v. Commissioner*, T.C. Memo. 1967-32. These features of the transaction satisfy us that Bussing is not a cotenant of the equipment, but instead joined a joint venture that shared undivided interests in equipment.

Moreover, the agreements executed between Bussing and AG together create a shared economic interest in the profits and losses of the venture. See *Commissioner v. Tower*, 327 U.S. 280 (1946). An equal sharing of profit and loss is no prerequisite to the existence of a partnership. The parties must intend only to pool resources and share the results of investment. Petitioners argue erroneously that section 1.761-1(a), Income Tax Regs., states that an individual cannot be a partner in a venture unless he contributes services, and not merely capital, to the venture. The plain language of the regulation states no such requirement. Sec. 1.761-1(a), Income Tax Regs. Each party contributed something of value—Bussing contributed capital; AG contributed services. *Commissioner v. Tower*, 327 U.S. 280, 287-288 (1946). The losses of the transaction are borne by the investors according to their percentage interest acquired. AG bears the risk of loss associated with the costs of remarketing the equipment. Bussing and the others depended on AG's expertise in the leasing market. AG depended on the underlying lease, and on the investors' financial commitments. While their relationship does not neatly fall into a pigeonhole, on balance in choosing between tenancy-in-common and joint venture we conclude that Bussing, AG, and the other investors entered into a joint venture for Federal income tax purposes.

Petitioners have failed to establish that any of the findings of fact or conclusions of law determined by the

Court in its opinion in this case filed February 23, 1987, are in error.

Accordingly, petitioners' motion for reconsideration of the Court's opinion will be denied.

*An appropriate order will be entered.*

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in issue.