WILLIAM G. AND BARBARA ALHOUSE, ET AL., [1] Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent Alhouse v. Commissioner
Docket Nos. 15084-89, 15613-89, 15620-89, 15670-89, 19723-89.
United States Tax Court
T.C. Memo 1991-652; 1991 Tax Ct. Memo LEXIS 694; 62 T.C.M. (CCH) 1678; T.C.M. (RIA) 91652; December 30, 1991, Filed *694 Orders will be entered granting respondent's motions to dismiss and granting respondent's motion to strike in docket No. 15613-89. Held: Petitioners' interests in a computer leasing program or in the computer equipment are partnership interests rather than those of joint owners. The program involved a series of financings, leases, transfers, and management obligations by which, together, the participants acquired computer equipment, financed their acquisition, leased the equipment, and arranged for the possible continuation of their relationship on the termination of the initial lease. Bussing v. Commissioner, 89 T.C. 1050 (1987), followed. Held further: No partnership return was filed and no FPAA was issued. Because the determinations pertain to partnership and affected items, we lack jurisdiction over the redetermination of related deficiencies in petitioners' Federal income tax. Maxwell v. Commissioner, 87 T.C. 783 (1986). Brian Thomas Davis, for the petitioners. Sandy Freund, for the respondent. HALPERN, Judge. HALPERN
MEMORANDUM OPINION These five cases were consolidated for the limited purpose of hearing and ruling *695 on the motions pending before us. The issue in each case involves petitioners' interest in a computer leasing program or computer equipment acquired in 1985. In docket Nos. 15084-89, 15620-89, and 19723-89, respondent moved to dismiss for lack of jurisdiction on the grounds that notices of deficiency issued therein for the year 1985 are invalid. In docket No. 15613-89, respondent moved to dismiss the portion of the case relating to the computer leasing transaction and to strike any portion of the notice of deficiency and pleadings pertaining thereto (the TEFRA items). In docket No. 15670-89, respondent moved to dismiss for lack of jurisdiction on the grounds that the statutory notice for the years 1982 and 1985 is invalid. The identical question presented by each motion is whether, in each case, one or the other (in some cases both) of the petitioners therein was a partner subject to the partnership audit and litigation rules contained sections 6221 through 6233. [2] Since no partnership return was filed and no notice of final partnership administrative adjustment (FPAA) issued, if we find that a partnership existed we must dismiss for lack of jurisdiction insofar as the individual *696 notices of deficiency pertain to partnership items or (affected items). See Maxwell v. Commissioner, 87 T.C. 783, 793 (1986). Background At a hearing held on September 24, 1990, no witnesses were presented by either party. One exhibit, a Management Agreement, was received into evidence as a joint exhibit. Other relevant facts that do not appear to be in dispute are evidenced in pleadings, motions and responses, and memoranda of law attached thereto. We deem the parties to have stipulated to such other relevant facts not in dispute. Rules 1(a) and 91(f)(4). The facts upon which we base our opinion are as follows. In December 1985, petitioners were among 78 participants in transactions whereby each participant entered into a Subscription Agreement with First AmeriGroup Securities, *697 Inc. (AmeriGroup Securities), subscribing for a unit or units of individual interest in AmeriGroup Equipment Program-Crystal Star Eagle (the CSE Program). The Confidential Placement Memorandum for the CSE Program states that it was formed in 1985 to offer qualified persons the right to acquire ownership interests as tenants-in-common in certain computer equipment. Using the words "sold," "acquired," or "purchased" solely for convenience and without legal implication, [3] the substance of the transaction was as follows. AmeriTec Leasing, Inc. (AmeriTec) purchased computer equipment from ComDisco, which equipment at that time was subject to a prior lease. AmeriTec leased the equipment back to ComDisco and sold the equipment to Eastwind Leasing Corporation (Eastwind). The participants then acquired an interest in the equipment either directly as coowners of the equipment (upon a purchase from Eastwind) or as coowners of the CSE Program (which itself purchased the equipment from Eastwind). The facts before us are unclear on those points. Simultaneously, as the participants acquired interests in the CSE Program or the computer equipment, the equipment was net leased back to AmeriTec *698 for a lease term of 84 months. Pursuant to the Subscription Agreements, each participant was required to deliver to AmeriGroup Management, Inc. (the Manager) the Subscription Price (Subscription Price) for each unit subscribed for. The Subscription Price consisted of cash and notes (the subscription Notes). A portion of the cash was used to make a downpayment on the equipment. Apparently, the Manager financed the remainder of the purchase price of the equipment, securing such financing with the Subscription Notes. The interest of each participant in the CSE Program was pledged to the Manager as security for the Subscription Notes executed by such participant. Each participant entered into the Management Agreement with the Manager. Pertinent provisions of the Management Agreement are as follows. The initial term of the Management Agreement is 1 year, after *699 which it shall continue from year to year for a maximum of 20 years, unless sooner terminated pursuant to its terms. Events of termination include breach or default, bankruptcy of a participant, destruction of the equipment, failure of the Manager to remarket the equipment, or notice of termination given at least 90 days prior to the end of any 1-year term. The Manager will arrange to finance the Subscription Notes on behalf of the participants and will carry out any refinancing. The Manager will collect equipment rentals and use them to pay off the financing of the equipment, distributing any surplus. The Manager may advance monies to participants on an interest-free basis to meet expected cash flow projections. Such advances are to be repaid out of future rentals (in excess of financing repayments). At the end of the initial lease, the Manager has the right to sell or lease (remarket) a participant's interest in the equipment. A majority vote of the participants will determine whether the equipment is to be sold or leased, with the Manager deciding in the absence of a majority vote. Participants may terminate the Management Agreement if there is an unsuccessful marketing *700 agreement. The equipment is not to be remarketed at less than its fair market value. The Manager is entitled to a remarketing fee of 10 percent of the selling price or lease rentals, reduced by remarketing expenses. Any participant who pays more than her pro rata share of liabilities is entitled to reimbursement from other participants. Each participant pledges her interest in the program to the Manager as security for payment of the Subscription Notes. On default of a participant's obligation to pay the Subscription Notes, the Manager can terminate the participant's interest in the program and may take steps to use the participant's interest in the program to satisfy the participant's obligation to pay the Subscription Notes. A participant may assign her interest in the program only upon fulfilling numerous conditions and obtaining the written consent of the Manager. If requested by the Manager, the participant must furnish a satisfactory opinion of counsel that such assignment does not violate applicable Federal or State securities laws. Notwithstanding such conditions, a participant may transfer a beneficial interest in her interest in the program provided that the Manager *701 is notified. Each participant grants to the Manager a broad power of attorney to carry out the obligations, and exercise the rights, of the Manager under the Management Agreement. Discussion We must decide whether participants in the CSE Program were members of a partnership for Federal tax purposes or whether they were tenants-in-common with the other participants in the CSE Program. A partnership is broadly defined as "a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on," which is not a corporation, trust, or estate. Sec. 7701(a)(2); sec. 1.761-1, Income Tax Regs. A partner is a member in such a syndicate, group, pool, joint venture, or organization. Id. In general, a partnership exists when persons "join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is a community of interest in the profits and losses." Commissioner v. Tower, 327 U.S. 280, 286, 90 L. Ed. 670, 66 S. Ct. 532 (1946). The existence of the requisite purpose is a question of fact that turns on the parties' intent. Commissioner v. Culbertson, 337 U.S. 733, 742, 93 L. Ed. 1659, 69 S. Ct. 1210 (1949). *702 Mere coownership of property and sharing of expenses, however, does not constitute a partnership. Sec. 1.761-1(a), Income Tax Regs; Madison Gas & Elec. Co. v. Commissioner, 633 F.2d 512, 514-515 (7th Cir. 1980). Moreover, while the existence or nonexistence of a partnership under common law or State law may be relevant, Federal law controls classification for Federal tax purposes. Estate of Kahn v. Commissioner, 499 F.2d 1186 (2d Cir. 1974), affg. a Memorandum Opinion of this Court; Luna v. Commissioner, 42 T.C. 1067, 1077 (1964); sec. 1.761-1(a), Income Tax Regs.
There are several factors to be weighed in determining whether a partnership exists, none of which alone is determinative. Thus, we look to: The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or *703 employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise. [Luna v. Commissioner, 42 T.C. at 1077-1078.]
We are also guided by the subtle distinctions set forth in examples in the regulations. Thus, joint owners of farm property who lease it to a farmer for a cash rental do not necessarily create a partnership, while coowners of an apartment building who lease space and, in addition, provide services to the occupants either directly or through an agent, do create a partnership. Sec. 761-1(a), Income Tax Regs.
Admittedly, the facts here do not fall neatly into one category or the other. However, we cannot agree with petitioners that we are precluded from determining that participants in a venture who lease *704 their interests in computer equipment under net leases and enter into comprehensive management agreements have entered into a partnership agreement for federal tax purposes. In such cases, we may look to the level of business activity conducted by the participants and whether the participants are required to deal with each other to realize the economic benefits from the property to distinguish between a cotenancy and a partnership. Bussing v. Commissioner, 89 T.C. 1050, 1060 (1987) (citations omitted). Although not cited by either party, the facts in the present case are in certain significant respects similar to those in Bussing v. Commissioner, supra. See also Bussing v. Commissioner, 88 T.C. 449 (1987). We believe that our holding in Bussing is here controlling. In Bussing, a Swiss entity, CIG Computers, AG (AG), purchased and leased back to the seller certain computer equipment. AG then purportedly transferred ownership of the equipment to a related entity, from which the taxpayer and four other investors purportedly purchased the equipment. Such investors then triple net leased the equipment back to AG. For his *705 interest, the taxpayer paid cash and issued promissory notes. The taxpayer executed a marketing agreement with AG under which AG was to apply any proceeds of the lease with AG first to the taxpayer's obligations on the promissory notes. The equipment remained subject to the prior lease between AG and the end user and AG's underlying debt incurred on its original purchase from the end user. On those similar facts, we stated: if as in this case, the seller-lessee retains an economic interest in current and additional rent as well as in residual value, what Bussing paid for seems to be a shared economic interest in the equipment. Although this shared economic interest does not neatly fall into any category, it falls well within the Federal income tax definition of a partnership and lacks the chief characteristic of a tenancy-in-common: viz, the ability to encumber, alienate, improve, and change the property owned without constraint of other owners -- by partitioning the property, if necessary. * * * [Fn. ref. omitted.] * * * As a practical matter, the equipment could not be partitioned by Bussing or any other investor. As marketing agent, AG warranted that the other investors *706 had executed identical agreements. The equipment had to remain in place and since all of the lease and debt obligations turned on the underlying lease and debt obligations, no investor (pursuant to the security agreement) could encumber the equipment. Moreover, the investors acted in concert with AG as conductor in a complex, long-term transaction to finance, lease, sublease, and remarket the equipment. See sec. 1.761-1(a), Income Tax Regs.; compare Estate of Appleby v. Commissioner, 41 B.T.A. 18 (1940), affd. 123 F.2d 700 (2d Cir. 1941); Powell v. Commissioner, T.C. Memo 1967-32. These features of the transaction satisfy us that Bussing is not a cotenant of the equipment, but instead joined a joint venture that shared undivided interests in equipment. Moreover, the agreements executed between Bussing and AG together create a shared economic interest in the profits and losses of the venture. See Commissioner v. Tower, 327 U.S. 280, 90 L. Ed. 670, 66 S. Ct. 532 (1946). An equal sharing of profit and loss is no prerequisite to the existence of a partnership. The parties must intend only to pool resources and share the results of *707 investment. * * * Each party contributed something of value -- Bussing contributed capital; AG contributed services. Commissioner v. Tower, 327 U.S. 280, 287-288, 90 L. Ed. 670, 66 S. Ct. 532 (1946). The losses of the transaction are borne by the investors according to their percentage interest acquired. AG bears the risk of loss associated with the costs of remarketing the equipment. Bussing and the others depended on AG's expertise in the leasing market. AG depended on the underlying lease, and on the investors' financial commitments. While their relationship does not neatly fall into a pigeonhole, on balance in choosing between tenancy-in-common and joint venture we conclude that Bussing, AG, and the other investors entered into a joint venture for Federal income tax purposes. [Bussing v. Commissioner, 89 T.C. at 1060-1062.]
Admittedly, the facts here are not identical to those in Bussing. Facts that we believe lead to the same result are as follows. The individual participants here are bound together by the Management Agreement. In theory, at least, they have the right to withdraw on a yearly basis. It is unclear, however, what would happen in the *708 event of a withdrawal (could a withdrawing coowner successfully maintain an action to partition?), or that the value of a withdrawn interest in the computer equipment would be more than minimal. Simply put, we believe that the right to withdraw is illusory in that the economic value of the investment lies in the many relationships that constitute the program. As mentioned, apparently there was either a single or joint loan to finance acquisition of the computer equipment. That loan was arranged by, and could be refinanced by, the Manager on behalf of the participants. It is unclear from the facts in front of us whether there was one loan or a number of loans obtained jointly. In any case, it appears to us that the financing was a joint enterprise in that it could not have been undertaken on the same terms, and the equipment acquired, unless there were sufficient participants and they grouped together to finance the purchase of the equipment. Whether at the end of the initial lease the Manager is to remarket the equipment under a lease or by sale depends on a majority vote of the participants, with the Manager deciding in the absence of a majority vote. Each participant pledges *709 her interest in the program in secure her Subscription Notes, and, on default of a participant's obligation to pay the Subscription Notes, the Manager can terminate the participant's interest in the program and may take steps to use the participant's interest in the program to satisfy her obligations under the Subscription Notes. Whether the Manager here is acting primarily in the interest of the defaulting participant or on behalf of a creditor or the other participants, by keeping the program running, is unclear. It does appear, however, that the Manager is serving interests beyond those of the defaulting participant and, in particular, the joint economic interest of all of the participants in keeping the program running. Transfer of an interest in the program is restricted. To paraphrase certain observations that we made in Bussing: Although not explicit in the Management Agreement, the agreement between the Manger and each of the participants required that participants to act in concert, and the Manager was designated as their agent to facilitate such action. The terms of the agreements executed by the participants establish that no participant could sell or lease the *710 equipment nor encumber it in any way without the consent of the other participants in the venture. See Bussing v. Commissioner, 89 T.C. at 1061. As in Bussing, the economic benefits to a participant were derivative of, and limited by, that participant's relationship to the Manager and other participants. See id. Moreover, as in Bussing, the Management Agreements between the participants and the Manager create a shared economic interest in the profits and losses of the venture. The participants contributed capital. Although the Manager is to be compensated in certain fixed amounts for its services, we cannot tell whether such fixed compensation is a sufficient match for the services to be rendered. It is clear, however, that the Manager has the right to remarket each participant's interest in the equipment at the end of the initial lease and to share in the net remarketing proceeds. That is similar to one aspect of the relationship in Bussing from which we concluded that AG and Bussing had joined together in a transaction in order to share profits and losses. Bussing v. Commissioner, 88 T.C. 449, 462-463 (1987). We find *711 the agreement as to remarketing persuasive that the Manager has a shared-profits interest in the residual value of the equipment, such interest received in consideration of services to be performed for the enterprise. With regard to losses of the enterprise, the participants would share in such losses. Apparently, it is also expected that the Manager would so share. Under the Management Agreement, the Manager may advance monies to participants on an interest-free basis to meet expected cash flow projections, such advances to be repaid out of future rentals in excess of amounts necessary to make financing payments. Commensurate with its intent to honor that commitment, the Manger has undertaken some financial risk. Although we cannot judge the degree of the Manager's intent, we assume that it is more than none. Thus, we think it fair to conclude that the Manager would, with the participants, jointly share in losses from the program. We conclude that the CSE Program involves more than an alternative way of describing coownership of the computer equipment. It involves a series of financings, leases, transfers, and management obligations by which, together, the participants acquire *712 computer equipment, finance their acquisition, lease the equipment, and arrange for the possible continuation of their relationship on the termination of the initial lease. As in Bussing, the relationship here amounts to more than cotenants merely engaging an agent to lease for them their jointly owned property in a transaction that, if they leased it themselves, would not cause a partnership to result for tax purposes. [4] See sec. 1.761-1(a), Income Tax Regs. We conclude that here the economic benefits to the individual participants were not derivative merely of their coownership of the computer equipment but rather were derivative of their joint relationship that, among other things, allowed them to negotiate a single or joint loan to finance their purchase of the equipment. Indeed, the individual participants here bought into a "program," a program by which they would take joint action towards a common goal. The aspects of that program are such that it must be classified as a partnership for tax purposes. *713 Because we held that a partnership was created in 1985, we agree with respondent that we must dismiss these consolidated cases for lack of jurisdiction insofar as the adjustments in the notices of deficiency pertain to partnership or affected items. Neither the CSE Program nor any other person filed a partnership information return for the year 1985. Respondent never conducted a partnership level audit or issued an FPAA with respect to that year. The adjustments here were made to the petitioners' individual Federal income tax returns and involve claimed depreciation, interest and expense deductions, and losses attributable to their interests in the CSE Program or the computer equipment. The items which were the subject of the adjustments are partnership item within the meaning of section 6231(a)(3) and section 301.6231(a)(3)-1, Proced. & Admin. Regs. Section 6221 requires that, generally, the tax treatment of any partnership item must be determined at the partnership level. However, because "the issuance of an FPAA is a condition precedent to a partnership action," we have no jurisdiction to redetermine any portion of a deficiency attributable to a partnership item. Maxwell v. Commissioner, 87 T.C. 783, 789 (1986). *714 Similarly, we lack jurisdiction over any carryback attributable to a partnership item which gives rise to deficiency determinations for earlier years. Respondent also determined individual liability for the additions to tax under section 6653(a), 6659, and 6661, and the increased interest for substantial underpayments attributable to tax-motivated transactions under section 6621(c). Those items are affected items within the meaning of section 6231(a)(5), the tax consequences of which flow from a partnership proceeding. Maxwell v. Commissioner, 87 T.C. at 791-793; sec. 301.6231(a)(5)-1T, Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6790 (March 5, 1987). Respondent's motions to dismiss and motion to strike as to TEFRA items will be granted. Orders will be entered granting respondent's motions to dismiss and granting respondent's motion to strike in docket No. 15613-89. Footnotes
1. Cases of the following petitioners are consolidated herewith: William A. Tauskey and Judith A. Tauskey, docket No. 15613-89; Gerald W. Bergford and Geraldine M. Bergford, docket No. 15620-89; John M. Damas and Nancy A. Damas, docket No. 15670-89; Monte S. Preece and Jerilyn F. Preece, docket No. 19723-89.↩
2. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Because of the limited issue in this case, we do not here decide whether, to whom, or at what level a sale of the computer equipment may have occurred.↩
4. We recognize that the seller of the equipment (AG) in Bussing↩ was also the lessee and the management agent, while here those functions appear to be divided between AmeriGroup Securities, AmeriTec, Eastwind, and AmeriGroup. We are not convinced, however, that the apparent separation of those roles is significant. Although we do not here decide, we are suspicious of the existence of any real and actual distinction between the entities. The similarity in names (except for Eastwind), the manner in which the intertwining purported purchase, lease, and remarketing agreements allocated control over the fate of the computer equipment, and the simultaneity of execution of documents in this case indicate a close interrelationship or common control.