EDWARD A. STEWART AND CHERYL K. STEWART, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Stewart v. Commissioner
Docket Nos. 39391-87; 913-88; 8600-88
United States Tax Court
T.C. Memo 1989-505; 1989 Tax Ct. Memo LEXIS 508; 58 T.C.M. (CCH) 152; T.C.M. (RIA) 89505; September 14, 1989
Scott G. Adams and Ligia Salcedo, for the petitioners. Karen E. Chandler, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: In these 95 consolidated cases, the Commissioner determined deficiencies, additions to tax, and increases in interest as set forth in the appendix to this opinion. After concessions, the issues remaining are (1) whether petitioners received price rebates on their purchase of solar heating panels, thus reducing their cost for purposes of computing the residential energy credit; if so, (2) whether petitioners are liable for additions to tax pursuant to section 6659; [2] (3) whether petitioners are liable for the additions to tax pursuant to sections 6653(a)(1) and 6653(a)(2); and (4) whether petitioners are liable for increased interest pursuant to section 6621(c). FINDINGS OF FACT The 95 petitioners [3] in this case bought solar panel systems for residential heating use in 1984 or in 1985. Three corporations in Northern Virginia marketed, *510 sold, and installed petitioners' systems: General Solar Energy, Inc. ("GSE"), Atlantic Solar Energy Corporation ("Atlantic"), and Alternative Energy Corporation ("Alternative") (collectively, the "Corporations"). Former Atlantic personnel formed GSE and Alternative. As a result, the Corporations sold similar products and used similar sales forms, techniques, and presentations. GSE, Atlantic, and Alternative promoted sales of the solar panel systems as producing available Federal and state energy tax credits based on a price which would in effect be returned to petitioners through the Corporations' "support agreements." Every purchaser of a solar panel system executed a support agreement ("support agreement") pursuant to which the Corporations paid a purchaser for certain designated services that would increase the visibility of the Corporations' promotions. Eighty-three petitioners purchased solar panels from GSE, nine petitioners purchased solar panels from Atlantic, and three petitioners purchased solar panels from *511 Alternative. Petitioners were satisfied with their solar heating systems. Ten petitioners, selected by counsel, testified at trial. The marketing offices of the Corporations through telephone solicitations provided their salesmen with leads for potential solar panel purchasers. With few exceptions, telephone solicitation was the method of initial contact with prospective purchasers. Referrals by purchasers provided the Corporations some additional leads; petitioners received a $ 200 fee if their referral resulted in a sale. Some petitioners obtained a Corporation's telephone number from one of the Corporations' display signs posted in purchasers' yards. The Corporations' salesmen followed up on the leads by making sales presentations in the homes of potential purchasers. All of the Corporations' salesmen used standard sales presentations. The standard sales presentation included, but was not limited to, information regarding the following: (1) the nature, quality and performance of the solar panel systems; (2) the Corporation's support agreement program; (3) the Corporation's history; (4) the Federal and state energy credits; (5) installation methods for solar panel systems; *512 and (6) the cost of the solar panel system to the purchaser. During the presentations, the salesmen explained the support agreements. GSE salesmen presented the support agreement as an opportunity to participate in GSE's advertising program. In the GSE support agreements, titled "Demographic Support Agreement," purchasers agreed to provide one or more of the following services: (1) allow photographs of the home during and after installation of the solar panels for display in the Corporation's literature; (2) obtain the previous two years' fuel-use records and keep comparative records for one full heating season (November through April); (3) allow a sign to be placed in the front yard for a specified number of days; (4) send an opinion letter after three months of heating-season experience with the system with authorization for reprint in corporate literature; (5) permit a specified number of tours of his house to view the solar heating system; and (6) permit his house to be "rented" as a solar display during a specified number of open houses. In the Atlantic and Alternative support agreements, titled "Homeowners Cooperative Advertising Exposure Program," purchasers agreed to *513 provide one or more of the following services: (1) allow his home to be photographed after installation; (2) obtain the fuel-use records for the previous 18 months and keep comparative records for one full heating season; (3) allow a sign to be placed in front of his house for a specified number of days; (4) send an opinion letter to the corporation for publication in the sales manual after three months of heating-season experience; and (5) permit a specified number of tours of his home to view the solar panels. GSE's salesman presented the amount of the payment pursuant to the support agreement to be $ 3,200 for two panels. Atlantic's sales material stated that the payment for the support agreement would be $ 1,800 for each panel. Alternative's payments for the support agreements were also $ 1,800 per panel. These amounts were the Corporations' standard support payments ("support payments"). Salesmen filled out work sheets during the sales presentations with a sample allocation of the support payment to the various services. The salesmen allocated the payments differently on different work sheets. For example, the amount allocated for "Refer to you as a local owner of the *514 system" was $ 300 on one work sheet and $ 100 on another. Allocations for "Sign erected on property for 12 days" were $ 400 and $ 200 on two different work sheets (for the $ 200 payment, photographing the house was also included), and allocations for "Record keeping and letter" were $ 600 on one work sheet and $ 200 on another. In addition, different petitioners agreed to perform different services for the standard support payment. For example, some petitioners agreed to hold six open houses for $ 3,200. Others agreed to hold six open houses and perform some of the other support services such as keep fuel records, write an opinion letter, and allow their home to be photographed for $ 3,200. Some agreed only to hold three open houses for the same $ 3,200 support payment. On at least one occasion, a salesman indicated during the sales presentation that the support agreement was a formality and that the purchaser would not have to perform the services. Salesmen told some petitioners that based on Internal Revenue Publication 527 (Rev. Nov. 1984), the amounts they received pursuant to the support agreements would be excludable from their income because they were rental payments. *515 Publication 527 is titled "Rental Property," and states, in part: Rental of a dwelling unit also used as a residence. If you rent a dwelling unit that you also use as a residence and you rent it for less than 15 days during the tax year, do not include the rent you receive in your gross income. The Corporations' theory for petitioners' exclusion of the support agreement payments was that petitioners would be "renting" their residences during the open houses and tours. Salesmen provided some petitioners with excerpts from Publication 527. The salesmen also showed Publication 903, "Energy Credits for Individuals," to some petitioners during the sales presentations. Publication 903 describes the Federal residential energy credit. The credits were an important factor in petitioners' decisions to purchase a solar heating system. The stated purchase price for each GSE solar panel was $ 4,495. The Atlantic and Alternative stated purchase price was $ 4,995 for each solar panel. The Corporations advised purchasers to buy two solar panels. The price was $ 8,990 for two GSE panels and $ 9,990 for two Atlantic or Alternative panels. The salesmen generally had no authority to *516 alter the purchase price; any negotiations were with regard to the amount of the support payments. Salesmen used worksheets during their presentations to illustrate out-of-pocket costs to prospective purchasers. The GSE work sheet provided as follows: Total price of (2) GSE Space Heating Systems, installed
$ 8,990.00 Federal Tax Credit of (40%) of $ 8,990.00 = $ 3,596.00
Virginia Tax Credit of (20%) of value or $ 899.00
per expenditure or system acquired = $ 1,798.00
Total Tax Credits
$ 5,394.00 Balance
3,596.00 General Solar Energy Residential Support payment
$ [3,200.00]
Balance
[396.00]
The GSE salesmen wrote in the amounts provided for "General Solar Energy Residential Support payment" and the "Balance" on the following line. The Atlantic work sheet similarly provided as follows: COST OF UNIT INSTALLED
$ 4,995.00
ATLANTIC SOLAR PAYS YOU
$ 1 800.00
BALANCE
$ 3,195.00
FEDERAL GOVERNMENT PAYS YOU
$ 1,998.00
BALANCE
$ 1,197.00
VIRGINIA GOVERNMENT PAYS YOU
$   999.00
BALANCE
$   198.00
The support payment and balance differed for some petitioners who negotiated for a higher support payment. For *517 example, for eight petitioners (Bena, Bouchard, Brenneman, Caddy, Edwards, Fenster, Irish, Levy), the salesmen increased the support payment just enough to reduce their balance payable to zero. For seven petitioners (Chatham, Gagliardo, Harasek, Hopson, King, Reynolds, Toole), the support payments were increased such that they profited from their purchase, with profits ranging from $ 2 to $ 302. When the support payment was increased, additional services were added only some of the time. The salesmen thus tailored the support agreements to fit the net cost each purchaser negotiated for. Petitioner Chatham's salesman first allocated $ 2,800 of the support payment to two open houses on the work sheet, and the remainder to other services. When Chatham pointed out that because he was in the military, he could not take full advantage of the Virginia credit, the salesman increased his support payment by $ 400 and added one open house to the services he agreed to perform. GSE sales representatives were instructed not to enter into any purchase agreements on their first visit to the potential purchasers' homes. Sometimes, however, purchase and support agreements were executed during *518 the first visit. Generally, the salesmen left informational brochures and a list of references with each petitioner. The brochures included information about the solar panel equipment and the Corporations, and general information about energy savings and the increased value to petitioners' homes as a result of the installation of solar panel systems. A form to request utility bills and a chart to be completed pursuant to the support agreement were also included in the materials provided to prospective purchasers in the initial sales presentation. After the initial sales presentation and prior to purchasing a system, many petitioners called the references the salesmen provided with regard to the quality and efficiency of the solar panels and the installation of the systems. Some petitioners made other reference checks regarding the Corporations and product efficiency and quality. Some petitioners called other dealers in solar panel systems to compare costs. In almost all instances, the dealers that petitioners contacted were GSE, Atlantic, and Alternative. Any other dealers they contacted generally did not offer the same products as GSE, Atlantic, and Alternative. Prospective *519 purchasers rarely attended either a tour or an open house prior to purchasing solar panels. The stated purchase price for the solar panel systems generally did not vary. In the limited circumstances when the stated purchase price varied, it only was increased. For example, petitioner Hopson paid $ 9,990 for two GSE panels, a $ 1,000 increase over the usual price. GSE also increased Hopson's support payment by a corresponding amount, to $ 4,200. The effect was to reduce Hopson's out-of-pocket expenditure by increasing his Federal and state energy tax credits; GSE's profit on the sale was unaffected by the equal increases. Eighty-one petitioners followed the Corporations' advice and purchased two solar panels. All except one of them executed two purchase agreements, one for each panel. The two agreements were executed on the same day, but the salesmen used a different date on each agreement. The salesmen used different dates to show that petitioners purchased two solar energy systems so that petitioners could claim two Virginia energy tax credits. All petitioners executed a support agreement when they purchased the solar panels. The actual support agreement listed services *520 the purchaser agreed to perform but did not include the allocation of the total payment between the services from the work sheet. The services petitioners agreed to perform were not the same services that the salesmen had selected on the work sheet. The total payment, however, remained exactly the same as shown on the work sheet, typically $ 3,200 for two GSE panels or $ 1,800 for each Atlantic or Alternative panel. No petitioner performed all of the services listed in his support agreement. Some petitioners obtained prior utility bills, and GSE solicited submission of the heating bill records from some petitioners by letter. The Corporations, however, failed to pick up the yard display signs from some petitioners. In addition, petitioners who agreed to hold six open houses held only one or two at most. The Corporations only sometimes provided corporate representatives or literature for the open houses. The open houses lasted approximately two hours, usually with only one to two people in attendance. Some petitioners were never asked to hold the tours and open houses provided for in the support agreement. The Corporations never asked some petitioners to perform any of the services. *521 The Corporations, however, always paid petitioners the entire support payment. The purchase agreements required that petitioners pay a deposit. The support agreements also provided for an initial payment to petitioners on the date of the agreement. With limited exceptions, the amount of the deposit equaled the amount of the initial support payment. The deposit and initial payment amounts were usually $ 1,500 for the standard $ 3,200 support agreement. Petitioners generally used the initial support payment as the deposit. When petitioners received a check for the initial support payment, they usually endorsed it over to and returned it to the Corporation. In fact, the letter that GSE sent to petitioners with the initial support payment check instructed petitioners to endorse the check over to GSE and return it as their deposit. A second check for the balance under the support agreement was due on or about the 21st day after installation. If petitioners used the entire amount of the support payment as a deposit, a check for the entire amount was presented and endorsed back over to the Corporation. If none of the support agreement payment was used as a deposit, petitioners received *522 the amount due within 21 days after installation. Some petitioners financed their solar panel purchases, either with commercial lenders or the Corporations. The amounts that petitioners financed sometimes exceeded their stated purchase price reduced by the amount of their support payment. The majority of petitioners at trial who financed their purchases executed retail installment contracts with the Corporations. Petitioners who purchased their solar panels from GSE or Alternative received Forms 1099 identifying the support payments as either rental income or nonemployee compensation. The characterization on the Form 1099, however, did not always reflect the types of services petitioners agreed to perform in the support agreements. For example, petitioners Anderson and Bennett both agreed to hold six open houses. Bennett's Form 1099 characterized the entire support payment as rent, consistent with GSE's exclusion-as-rental-income theory. Conversely, Anderson's Form 1099 characterized the entire support payment as nonemployee compensation. Petitioner Caddy agreed to allow home photographing, to keep fuel records, to write an opinion letter and to hold four open houses, but the *523 Form 1099 from GSE listed the entire support payment as rent. The income exclusion was important to some purchasers. Petitioner Chatham, who agreed to perform a variety of support services including the tours and open houses, received a Form 1099 from GSE that showed all of his support payments as taxable nonemployee compensation income. He contacted GSE because he understood that he could exclude part of his support payment from income. GSE and Chatham then executed a new support agreement, backdated to the date of the original, in which Chatham agreed only to hold open houses. GSE also issued a new Form 1099 characterizing Chatham's entire support payment as rental income. Petitioner Hopson also received a Form 1099 reporting his support payments entirely as taxable nonemployee compensation income when he had agreed to provide a variety of services, including the tours and open houses. When Hopson contacted GSE, however, GSE refused to change the Form 1099. Hopson then disregarded the Form 1099. When preparing their tax returns, most petitioners ignored the Forms 1099. Thirteen petitioners reported nontaxable rental income and eight reported nonemployee compensation income. *524 Some petitioners confirmed with the IRS that rental income for less than 15 days is excludable from income. They did not, however, ask if the services in their support agreements would generate rental income. GSE reported $ 9,573,415 in gross receipts or sales for taxable year 1985. GSE deducted $ 3,500,072 in support agreement payments as "Other Deductions" on line 22 of its Form 1120S for 1985. GSE deducted $ 2,703,580 for cost of goods sold and/or operations. Atlantic deducted support agreement payments on line 23 of its Form 1120 as part of $ 1,112,286 in "Advertising" for the taxable year beginning June 1, 1984, and ending May 31, 1985. Atlantic deducted $ 1,384,143 for cost of goods sold and/or operations. GSE, Atlantic, and Alternative went out of business in 1986, sometime during or subsequent to the first quarter of 1986. OPINION The principal issue before us is whether the amounts paid to petitioners pursuant to the support agreements were rebates of a portion of the purchase price of the solar heating panels. If they were, petitioners' basis on which the energy tax credits were computed would be reduced which would in turn reduce the amount of credits to which *525 petitioners were entitled. Petitioners purchased solar panels from one of the Corporations in 1984 or 1985. In connection with each purchase, petitioners executed purchase agreements and support agreements. Pursuant to the support agreements, the Corporations paid petitioners approximately one-third of the purchase price stated in the purchase agreements in return for petitioners' agreement to perform services such as displaying the Corporation's sign on their lawn, keeping fuel records, writing an opinion letter, and holding tours and open houses for others to view the solar panels. Petitioners argue that the amounts they received pursuant to the support agreements were in consideration of their performing the agreed-upon services. Respondent contends that the amounts the Corporations paid petitioners in support payments were rebates that reduced the cost of the panels for purposes of determining the correct energy tax credits. Section 23 provides for a residential energy tax credit. The credit, as relevant to this case, is 40 percent of up to $ 10,000 of "qualified renewable energy *526 source" expenditures. Secs. 23(a)(2), 23(b)(2). Renewable energy source expenditures include expenditures for property that uses solar energy to heat, cool, or provide hot water or electricity for use in the taxpayer's principal residence. Sec. 23(c)(5)(A). The parties agree that expenditures for the solar panels are renewable energy source expenditures. The amount of the expenditure that qualifies for the credit is the cost of the property. Sec. 23(c)(7)(C). Cost is the amount paid for property in cash or other property. Sec. 1.1012-1(a), Income Tax Regs. A rebate from the seller to the buyer, not given for any consideration other than the purchase, reduces the cost of the property to the buyer. See Max Sobel Wholesale Liquors v. Commissioner, 630 F.2d 670, 672 (9th Cir. 1980), affg. 69 T.C. 477 (1977); Pittsburgh Milk Co. v. Commissioner, 26 T.C. 707, 716-717 (1956). In Pittsburgh Milk Co. v. Commissioner, supra, we considered whether a payment from seller to purchaser in conjunction *527 with the sale of milk was a rebate, in order to determine the seller's gross income. Although the purchaser's cost was not at issue, the same principle applies here: Where, as here, the intention and purpose of the allowance was to provide a formula for adjusting a specified gross price to an agreed net price, and where the making of such adjustment was not contingent upon any subsequent performance or consideration from the purchaser, then, regardless of the time or manner of the adjustment, the net selling price agreed upon must be given recognition for income tax purposes. Pittsburgh Milk Co. v. Commissioner, supra at 717. Accord Atzingen-Whitehouse Dairy, Inc. v. Commissioner, 36 T.C. 173, 181 (1961). The substance of a transaction as a whole rather than its form determines its effect for Federal income tax purposes. Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). We hold that the support payments in this case were price *528 rebates, in substance given for no consideration other than the purchase of the solar panels. Petitioners' cost for income tax purposes, therefore, is the stated purchase price reduced by the support agreement payments. The Corporations paid petitioners predetermined amounts as support payments. For GSE, the standard amount was $ 3,200 for two panels. Atlantic and Alternative generally paid $ 1,800 per panel in support payments. These amounts were disproportionately large for the services required in exchange for the payments. The salesmen arbitrarily allocated the support payments among the various services on work sheets during sales presentations. For example, the allocated amount for keeping fuel records and writing an opinion letter was $ 600 for one petitioner and $ 200 for another. Also, in exchange for this standard predetermined amount, the assortment of services petitioners agreed to perform was inconsistent from one petitioner to the next. For example, for the same $ 3,200 payment, different petitioners agreed to: (1) hold six open houses; (2) hold six open houses and perform some of the other support services such as to keep fuel records, write an opinion letter, *529 and allow the Corporation to photograph their home; or (3) only hold three open houses. Petitioners received the predetermined support agreement amounts even though they performed few or none of the services they had agreed to provide. Those services that were performed were de minimis. GSE frequently left its signs in petitioners' yards until petitioners threw them away. In some cases, the Corporations never gave petitioners a sign to display. Petitioners who agreed to hold six open houses held only one or two, if any at all. Any open houses that were held were not promoted and had very low attendance; in many cases, only one or two people attended. The Corporations were indifferent as to the conduct of the open houses, only sometimes providing corporate literature or corporate representatives. Some petitioners were never asked to hold the tours or open houses they had agreed to. The open houses, therefore, were not the indispensable marketing tool petitioners claim them to be. The parties stipulated that with limited exceptions, telephone solicitation was the method of initial contact with prospective purchasers. The testimony of the Corporations' salesmen confirmed that *530 almost all of their leads for prospective purchasers were obtained from telephone solicitation and not from petitioners' support services. The Corporations offered the solar panels for sale at a price set by reference to the standard support payment and available tax credits. In the GSE standard presentation, a purchaser could buy panels ostensibly worth $ 8,990 for a total out-of-pocket expense of $ 396. If a particular petitioner did not want to pay even the $ 396 for a GSE system, their support payment would be increased until their cost was zero. At least one petitioner came out $ 100 ahead because GSE increased both his stated purchase price and support agreement payment by $ 1,000. The increases offset each other and had no effect on GSE profit, but increased the petitioner's credits. Also, when GSE increased the support payment, it did not add any services to the petitioner's agreement. Six other petitioners also profited on their purchase because the Corporations increased their support payments. We believe that the "support payments" were inextricably woven with the net cost petitioners expected to pay, that neither the Corporations nor the petitioners expected any *531 substantial services to be performed, and that in effect the support payments were rebates to petitioners of a portion of the stated purchase price. The stated purchase price was higher than the agreed cost to allow petitioners to claim higher energy credits. We note that the stated purchase prices, $ 8,990 and $ 9,990, are just under the $ 10,000 cost limit for the section 23 credit. One petitioner's support payment was increased by $ 400 because he was in the military and could not take full advantage of the state credit. The salesman added one more open house to his support agreement for the $ 400; he had already agreed to hold two open houses for $ 2,800. Two open houses, therefore, were "worth" $ 2,800 to the Corporation while a third open house was "worth" $ 400. Most petitioners also claimed two state tax credits because the Corporations used two sales contracts for one, two-panel system. We conclude that the Corporations used the high stated purchase price in conjunction with a rebate to manipulate artificial results in applying the Federal income tax laws. In addition, the Corporations told some petitioners that the support payments were excludable from income pursuant *532 to the exception allowing exclusion of rental income from a dwelling rented for less than 15 days. The payments were not includable in income, but not because they were rental income. The amounts paid to petitioners pursuant to the support agreements were excludable from income because they were purchase price rebates. Further, the Corporations' deposit arrangement reveals the nature of the support payments. The deposit amount generally equalled the initial support payment amount. These amounts typically were slightly less than half of the entire support payment. Petitioners uniformly endorsed the initial support payments back to the Corporations in satisfaction of the deposit required by the sales agreement. The Corporations thus arranged the transactions so that the support payments directly reduced petitioners' cost. Petitioners argue that they entered into the transactions at arm's length, and, therefore, the cost is the stated purchase price. We agree with petitioners that the transactions were at arm's length. We disagree, however, with petitioners' assertion that the arm's-length cost to petitioners was the stated purchase price. The cost that petitioners negotiated *533 for was the stated purchase price reduced by the support payments. This net arm's-length cost is the amount of petitioners' expenditure for Federal income tax purposes. Petitioners next argue that the support agreements were valid, legally enforceable contracts, and that the transactions were not shams. Respondent did not argue that the transactions were shams. A transaction may have economic substance, but that "does not imply * * * that each part of the transaction is genuine." Bussing v. Commissioner, 89 T.C. 1050, 1058 (1987) (supplemental opinion). We believe the purchase agreement and support agreement together show that petitioners' cost is the stated purchase price reduced by the support payment amounts. Petitioners also generally argue that we should allow all of the claimed credits because Congress, by enacting section 23, meant to encourage the transactions at issue. Congress indeed intended to encourage the use of solar energy (among other activities) as an energy conservation measure, and provided the residential energy credit as an incentive. S. Rept. *534 95-529 (1977), 1978-3 C.B. (Vol. 2) 222. The incentive, however, is a credit of 40 percent of the purchaser's cost, not of some greater amount. Sec. 23(c)(7)(C). Respondent in fact allowed petitioners a credit in the amount of 40 percent of the cost. Petitioners' argument, therefore, is of no consequence. In addition to the support payments, some petitioners received referral fees. For each referral that resulted in a sale, the Corporations paid petitioners $ 200. The parties agree that the referral fees are income to those petitioners. Additions to Tax
Respondent determined additions to tax pursuant to section 6659, which provides for an addition to tax if an underpayment of tax is attributable to a valuation overstatement. A valuation overstatement exists if the value of property, or the adjusted basis of property, claimed on a return is 150 percent or more of the correct value. Sec. 6659(c). The addition is 10 percent of an underpayment attributable to a 150 to 200 percent overvaluation. Sec. 6659(b). The underpayment attributable to the overvaluation *535 must be at least $ 1,000. Sec. 6659(b). In the standard GSE sale, petitioners used the stated price, $ 8,990, to calculate energy credits. The correct cost for the energy credit computation in a standard sale is $ 5,790, the arm's-length cost. See Narver v. Commissioner, 75 T.C. 53, 97 (1980), affd. 670 F.2d 855 (9th Cir. 1982). We believe that an arm's-length cost is equal to fair market value. The valuation overstatement, from $ 5,790 to $ 8,990, was greater than 150 percent and less than 200 percent. We sustain respondent's determination that each petitioner with a similar relationship between their stated purchase price and actual cost (i.e., valuation overstatement between 150 and 200 percent) is liable for the section 6659 addition to tax. Respondent also determined an increase in interest pursuant to section 6621(c), formerly section 6621(d), for those petitioners who are liable for the addition to tax pursuant to section 6659. Section 6621(c) provides for an increase in interest to 120 percent of the applicable rate for underpayments exceeding *536 $ 1,000 attributable to tax motivated transactions. The term "tax motivated transaction" includes any section 6659(c) overvaluation. Sec. 6621(c)(3)(A)(i). We sustain respondent's determination for petitioners liable for the section 6659 addition whose underpayments exceeded $ 1,000. We do not sustain respondent's section 6621(c) increase for petitioners David K. and Rebecca K. Anderson or for petitioner Kris Ritchie. The parties stipulated that the Andersons' determined deficiency was $ 303.85 and Ritchie's determined deficiency was $ 768. Because their underpayments were less than $ 1,000, the section 6621(c) increase in interest by its terms does not apply. Respondent determined the addition to tax for negligence pursuant to sections 6653(a)(1) and 6653(a)(2) for the taxable years 1984 and 1985, and pursuant to sections 6653(a)(1)(A) and 6653(a)(1)(B) for the taxable year 1986, against the petitioners that computed their energy credits based on the stated purchase price and did not report the support payments as income. For purposes of section 6653(a), negligence is defined as lack *537 of due care or failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners reported the transactions as they were instructed. The solar panels operated as promised; petitioners were satisfied with their solar heat. This scheme, increasing the stated purchase price to get a higher credit and then rebating part of the purchase price, was a gimmick that a tax professional would have recognized. We cannot expect petitioners, however, who are not tax professionals, to realize that the transaction was designed to manipulate the tax laws. This is especially true because some petitioners consulted tax return preparers and received erroneous advice that the credits should be computed using the stated purchase price. We hold that petitioners were not negligent. Respondent relies on petitioners' failure to include the support payments in income in determining negligence. Even a lay person would know that the amounts received pursuant to the support agreements were not rent. Excluding these payments as "rentals" within the 15-day de minimis exclusion rule ordinarily would be negligent. *538 In this case, however, the failure to report the income fortuitously was correct because rebates are not includable in income. We cannot hold petitioners liable for correctly reporting the support agreement payments. [4]
Decisions will be entered under Rule 155. APPENDIX The Commissioner determined the following deficiencies, additions to tax, and increases in interest. The taxable year at issue for each petitioner is 1985, except as noted below. [1]
Additions to Tax
Petitioner(s)
Sec.
Sec.
Sec.
and Residence
Deficiency
6653(a)(1)
6653(a)(2)
6659
Docket No.
913-88
* Adam, Raymond W. &
$ 1,174.00
$ 58.70 **
$ 117.40
Henrietta M.
Woodbridge, Virginia
* Anderson, David K. &
$ 303.85
$ 15.19 **
--
Rebecca K.
Woodbridge, Virginia
Baker, Millard C. III
$ 746.00
--  --
--
Springfield, Virginia
Bates, Lawrence A. &
$ 384.00
--  --
--
Kathy J.
Dale City, Virginia
* Bellas, Lewis J. &
$ 1,280.00
$ 64.00 **
$ 128.00
Julia P.
Oakton, Virginia
Bena, Fred B. &
$ 370.40
--  --
--
Bonnie K.
Fairfax, Virginia
* Benedict, Ronald L.
$ 1,364.00
$ 68.20 **
$ 128.00
Fairfax, Virginia
* Bennett, Willard W.
$ 1,280.00
$ 64.00 **
$ 128.00
& Thelma C.
Bristow, Virginia
Bouchard, James R. &
$ 435.00
--  --
--
Beverley C.
Woodbridge, Virginia
* Brenneman, Robert &
$ 1,438.00
$ 71.90 **
$ 143.80
Audrey Ann
Woodbridge, Virginia
Brinkman, Ray A. &
$ 799.00
$ 39.95 **
--
Maryjean
Sterling, Virginia
* Burgoon, Michael K.
$ 1,280.00
$ 64.00 **
$ 128.00
& Rebecca J.
Herndon, Virginia
* Byrne, Robert J. &
$ 1,280.00
$ 64.00 **
$ 128.00
Lynn P.
Sterling, Virginia *Caddy, William J. &
$ 1,438.40
$ 71.92 **
$ 143.84
Penny M.
Woodbridge, Virginia
* Chatham, Howard M. &
$ 1,269.47
$ 63.45 **
$ 126.95
Catherine M.
Vienna, Virginia
* Clair, Richard J. &
$ 1,280.00
$ 64.00 **
$ 128.00
Roselyne E.
Fairfax, Virginia *Cokes, John I. &
$ 1,442.00
$ 72.10 **
$ 144.20
Maria L.
Herndon, Virginia
* Coleman, Thea A. &
$ 1,280.00
$ 64.00 **
$ 128.00
Delois M.
Alexandria, Virginia
* Denick, Gary J. &
$ 1,280.00
$ 64.00 **
$ 128.00
Cindy L.
Alexandria, Virginia
* Dickerson, Robert W.
$ 1,280.00
$ 64.00 **
$ 128.00
& Bonnie G.
Manassas, Virginia
* DiLauro, James R. &
$ 1,280.00
$ 64.00 **
$ 128.00
Susan L.
Dumfries, Virginia
* Dorow, Richard H. &
$ 1,358.00
$ 67.90 **
$ 135.80
Diane M.
Manassas, Virginia
* Durant, Luther &
$ 1,684.00
$ 84.20 **
$ 168.40
Margaret A.
Alexandria, Virginia
* Edwards, John R. III
$ 1,598.00
$ 79.90 **
$ 159.80
& Joann J.
Oakton, Virginia
* Elder, James Leo &
$ 1,280.00
$ 64.00 **
$ 128.00
Patricia A.
Springfield, Virginia
* Eucker, Bobby E. &
$ 1,280.00
$ 64.00 **
$ 128.00
June C.
Alexandria, Virginia
* Exley, Randall L. &
$ 1,280.00
$ 64.00 **
$ 128.00
Cherry D.
Fairfax, Virginia
*Fairchild, David A.
$ 1,280.00
$ 64.00 **
$ 128.00
& Margherita D.
Great Falls, Virginia
* Faudale, Joseph A., Jr.
$ 1,440.00
$ 72.00 **
$ 144.00
& Rita
Springfield, Virginia
* Fenster, Herbert M.
$ 1,438.00
$ 71.90 **
$ 143.80
& Lynn M.
Woodbridge, Virginia
Ford, Carl D., Jr. &
$ 398.00
--  --
--
Linda O.
Sterling, Virginia
* Gagliardo, Joseph C.
$ 1,600.00
$ 80.00 **
$ 160.00
& Maria G.
Dumfries, Virginia
Ganze, Robert H. &
$ 753.00
$ 37.65 **
--
Mary C.
Centreville, Virginia
* Gotshall, Joseph S.
$ 1,280.00
$ 64.00 **
$ 128.00
Stafford, Virginia *Grier, Kenneth E. &
$ 1,280.00
$ 64.00 **
$ 128.00
Vicky M.
Woodbridge, Virginia
* Griffin, James A., Jr.
$ 1,280.00
$ 64.00 **
$ 128.00
& Patricia R.
Woodbridge, Virginia
* Hammerud, Gordon W.
$ 1,280.00
$ 64.00 **
$ 128.00
& Patrice A.
Woodbridge, Virginia
* Harasek, John J. &
$ 2,480.00
$ 124.00 **
$ 248.00
Lorraine P.
Fairfax, Virginia
Hilton, Larry A. &
$ 800.00
$ 40.00 **
--
Susan D.
Woodbridge, Virginia
Hoppe, Christopher J.
$ 375.00
--  --
--
& Jean M.
Stafford, Virginia
* Hopson, Robert C. &
$ 1,680.00
$ 84.00 **
$ 168.00
Nancy C.
Manassas, Virginia
* Howell, Thomas A. &
$ 1,520.00
$ 76.00 **
$ 152.00
Jeanette A.
Manassas, Virginia
* Huffman, Whitson H.
$ 1,280.00
$ 64.00 **
$ 128.00
& Phyllis J.
Woodbridge, Virginia
* Irish, Kenneth M., Jr.
$ 1,598.00
$ 79.90 **
$ 159.80
& Margaret J.
Oakton, Virginia
* King, Larry N. &
$ 1,240.00
$ 62.00 **
$ 124.00
Coleen J.
Warrenton, Virginia
* LaScala, Vincent S.
$ 1,440.00
$ 72.00 **
$ 144.00
& Delores A.
Great Falls, Virginia
* Lee, Stephen W. &
$ 1,266.00
$ 63.30 **
$ 126.60
Jeanne M.
Woodbridge, Virginia
* Levy, Joseph A. &
$ 1,438.00
$ 71.90 **
$ 143.80
Hella Page
Woodbridge, Virginia
Lippert, David G. &
$ 675.00
$ 33.75 **
--
Mona D.
Woodbridge, Virginia
* Lore, Gary L. &
$ 1,038.00
$ 51.90 **
$ 103.80
Janet M.
Herndon, Virginia
* Lore, Gary V. &
$ 1,075.00
$ 53.75 **
$ 107.50
Denise A.
Woodbridge, Virginia
Lykins, Chester J. &
$ 793.00
$ 39.65 **
--
Sally J.
Annandale, Virginia
* McAloon, Albert J. &
$ 1,400.00
$ 70.00 **
$ 140.00
Judith H.
Springfield, Virginia
* McCallister, Richard W.
$ 1,520.00
$ 76.00 **
$ 152.00
& Margery L.
Manassas, Virginia
* McClellan, John M. &
$ 1,280.00
$ 64.00 **
$ 128.00
Michelle P.
Fairfax, Virginia
* McGee, Melvin E. &
$ 1,360.00
$ 68.00 **
$ 136.00
Bettie J.
Woodbridge, Virginia
* McLaughlin, Michael D.
$ 1,440.00
$ 72.00 **
$ 144.00
& Darlene E.
Woodbridge, Virginia
* Mark, William Y., Jr.
$ 1,482.00
$ 74.10 **
$ 144.00
& Jill Ann
Woodbridge, Virginia
* Markham, John T. &
$ 1,438.00 *** $ 71.90 **
$ 143.00
Nancy J.
Stafford, Virginia
* Morrow, Harvey W. &
$ 1,404.00
$ 70.20
*
$ 140.40
Martha E.
Manassas, Virginia
Myers, D. Craig &
$ 730.00
--  --
--
Debra K.
Fairfax, Virginia
* Nehrt, Roy C. &
$ 1,280.00
$ 64.00 **
$ 128.00
Virginia S.
Springfield, Virginia
* Pace, Timothy C. &
$ 1,280.00
$ 64.00 **
$ 128.00
Beverly J.
Annandale, Virginia
Pendleton, Mathew F.
$ 432.00
--  --
--
& Betty M.
Fredericksburg, Virginia
Petersen, Harry V. &
$ 382.00
--  --
--
Mildred E.
Woodbridge, Virginia
* Pinard, Jean M. &
$ 1,280.00
$ 64.00 **
$ 128.00
Laurel J.
Springfield, Virginia
* Placke, William T. &
$ 1,280.00
$ 64.00 **
$ 128.00
Mattie I.
Manassas, Virginia
* Port, Christopher T. &
$ 1,360.00
$ 68.00 **
$ 136.00
Jane K. Stewart
Manassas, Virginia
Purdy, Lawrence B. &
$ 758.00
$ 37.96 **
--
Anne T.
Manassas, Virginia
* Rand, James M. &
$ 1,524.00
$ 76.20 **
$ 152.40
Bernita M.
Manassas, Virginia
* Reesey, Dean V. &
$ 1,280.00
$ 64.00 **
$ 128.00
Ruth E.
Woodbridge, Virginia
* Reynolds, D.S., Jr. &
$ 1,200.00
$ 60.00 **
$ 120.00
Rachel M.
Springfield, Virginia
* Ritchie, Kris
$ 768.00
$ 38.40 **
--
Sterling, Virginia
* Rood, Robert M.&
$ 1,404.00
$ 70.20 **
$ 140.40
Joan M.
Oakton, Virginia
* Ross, Robert G. &
$ 1,280.00
$ 64.00 **
$ 128.00
Marilyn M.
Woodbridge, Virginia
* Shaughnessy, Timothy F.
$ 1,359.00
$ 67.95 **
$ 135.90
& Lana M.
Alexandria, Virginia
* Sisco, Joseph
$ 1,218.00
$ 60.90 **
$ 121.80
Fredericksburg, Virginia
Stensland, John N. &
$ 480.00
--  --
--
Roberta
Herndon, Virginia
* Tetreault, Maurice A.
$ 1,360.00
$ 68.00 **
$ 136.00
& Gale A.
Stafford, Virginia
* Thomas, Fred L. &
$ 1,400.00
$ 70.00 **
$ 140.00
Zena M.
Annandale, Virginia
* Toole, Alfred D. &
$ 1,160.00
$ 58.00 **
$ 116.00
Rosie W.
Woodbridge, Virginia
* Worthen, Lee Kent &
$ 1,240.00
$ 62.00 **
$ 124.00
Patricia R.
Woodbridge, Virginia
* Young, Howard R. &
$ 1,280.00
$ 64.00 **
$ 128.00
Hester M.
Chantilly, Virginia
* Zupan, David L. &
$ 1,280.00
$ 64.00 **
$ 128.00
Dolores A.
Manassas, Virginia
Docket No.
8600-88
* Beardshear, Donald L.
$ 1,600.00
$ 80.00 **
$ 160.00
& Betty K.
Manassas, Virginia
Cantwell, William D.
$ 2,250.00
--  --
--
& Wendy L.
Bristow, Virginia
* Godine, Dominic M. &
$ 1,280.00
$ 64.00 **
$ 128.00
Jeanne I.
Stafford, Virginia
* Gunnels, John R. &
$ 1,280.00
$ 64.00 **
$ 128.00
Jean D.
Vienna, Virginia
Ierley, Elwood L., Jr.
$ 137.00
--  --
--
& Kathryn M.
Woodbridge, Virginia
* Menth, William C. &
$ 1,279.92
$ 64.00 **
$ 127.99
Kathleen S.
Springfield, Virginia
Ritchie, Ronald M. &
$ 505.00
$ 25.25 **
--
Dianne K.
Berryville, Virginia
* Ritchie, William J.
$ 1,438.40
$ 71.92 **
$ 143.84
& Harriet B.
Centreville, Virginia
Schrum, Paul M., Jr. &
$ 85.00
--  --
--
Anna Q.
Stafford, Virginia
Wilson, Charles H. &
$ 384.00
--  --
--
Elizabeth H.
Vienna, Virginia
Docket No.
39391-87
* Stewart, Edward A. &
$ 1,280.00
$ 64.00 **
$ 128.00
Cheryl K.
Dumfries, Virginia
*539 The parties stipulated that the deficiencies at issue for petitioners Hilton, Lore, McGee and Reynolds, docket No. 913-88, are as follows: Petitioner
Deficiency
Hilton, Larry A. &
$ 801.00 Susan D.
Lore, Gary L. &
$ 1,014.00 Janet M.
McGee, Melvin E. &
$ 1,346.00 Bettie J.
Reynolds, D. S., Jr. &
$ 1,252.00 Rachel M.
The additions to tax and the increases in interest determined in the notices of deficiency remain at issue for these petitioners. The following petitioners conceded increases in their deficiencies and additions to tax for 1985: Conceded
Conceded § 6653(a)(1)
Petitioner
Deficiency
Addition to Tax
Docket No. 913-88
Edwards, John R. III &
$ 62.02
Joann J.
Harasek, John J. &
$ 363.00
$ 18.15
Lorraine P.
Hoppe, Christopher J.
$ 784.00
& Jean M.
Lore, Gary V. &
$ 43.19
Denise A.
Morrow, Harvey W.
$ 76.08
& Martha E.
Port, Christopher T.
$ 73.13
& Jane K. Stewart
Tetreault, Maurice A.
$ 54.02
& Gale A.
56.00
$ 2.80
Docket No. 8600-88
Ritchie, Ronald M. &
$ 34.70
Dianne K.
*540 The deficiencies, additions to tax and increases in interest determined in the notices of deficiency for these petitioners remain at issue. Footnotes
1. Cases of petitioners in docket Nos. 913-88 and 8600-88, set forth in the appendix to this opinion, are consolidated with this case. Petitioners in docket No. 39920-87S, Joseph Robert Hribar and Marilyn Hribar, and in docket No. 886-88S, Francis Randolph Newell, Jr., have agreed to be bound by the outcome of this case.↩
2. All section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, unless otherwise indicated.↩
3. We will refer to each married couple that filed a joint return as petitioner in the singular. The 95 petitioners, therefore, are 95 individuals or couples.↩
4. Petitioners conceded negligence "to the extent they prepared their own returns * * * and failed to properly report the non-rental income." Petitioners that did not report the rebates as income properly excluded the rebates from their income. The concession, therefore, is of no effect.↩
1. The taxable years at issue for petitioners John J. & Lorraine P. Harasek are 1984 and 1985; the taxable year at issue for petitioners Chester J. & Sally J. Lykins and Lawrence B. & Anne T. Purdy is 1984; and the taxable year at issue for petitioners John T. & Nancy J. Markham is 1986.↩
*. The Commissioner determined increased interest pursuant to section 6621(c), formerly section 6621(d), for these petitioners. ** 50% of the interest due on the portion of the deficiency attributable to negligence. *** For 1986, the addition to tax for negligence is pursuant to sections 6653(a)(1)(A) and 6653(a)(1)(B)↩.