GEORGE J. AND VIRGINIA D. EMERSHAW, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Emershaw v. Commissioner
Docket No. 23223-87
United States Tax Court
T.C. Memo 1990-246; 1990 Tax Ct. Memo LEXIS 253; 59 T.C.M. (CCH) 621; T.C.M. (RIA) 90246; May 21, 1990, Filed *253 Decision will be entered for the petitioners. Richard P. Swanson and Jennifer B. Ungar, for the petitioners. Elizabeth P. Flores and Martin L. Shindler, for the respondent. WELLS, Judge. WELLS
*866 MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in and additions to petitioners' Federal income tax: Additions to Tax
Under Sections [1]
Year
Deficiency
6653(a)(1)
6653(a)(2)
6661
1983
$  3,752
$   187.60
* -0-
1984
21,566.14
1,078.31
**
$ 5,391.54
Respondent also determined that petitioners were liable for increased interest pursuant to section 6621(c). The instant case presents the following issues: (1) whether a sale and leaseback of computer equipment had economic substance, (2) whether *867 the benefits and burdens of ownership were transferred to petitioner George Emershaw, (3) whether petitioner George Emershaw had an actual and honest profit objective, (4) whether *254 section 465(a) limits petitioners' ability to deduct losses from the sale and leaseback transaction, (5) whether petitioners are liable for additions to tax for negligence pursuant to section 6653(a), (6) whether petitioners are liable for the addition to tax for substantial understatement of income tax pursuant to section 6661 for 1984, and (7) whether petitioners are liable for increased interest pursuant to section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners are husband and wife and resided in Akron, Ohio, when they filed their petition. For 1983 and 1984, petitioners filed joint Federal income tax returns.
The Sale and Leaseback Transaction
Purchases by CIS- The computer equipment which is the subject matter of the sale and leaseback transaction was initially purchased by CIS Leasing Corporation ("CIS") in three separate transactions. On September 9, 1982, CIS purchased from International Business Machines ("IBM") computer equipment for a price of $ 360,786. By a lease agreement dated September 7, 1982, CIS leased that equipment to American *255 Telephone and Telegraph Company ("AT&T"; hereafter, the equipment leased to AT&T will be referred to as "the AT&T equipment"). The AT&T equipment consisted of 10 model 3350-A02 and 9 model 3350-B02 disk storage units. On November 11, 1982, CIS purchased from IBM computer equipment for a price of $ 1,042,842. By a lease agreement dated November 11, 1982, CIS leased that equipment to Cooper Industries, and the equipment was placed in service at divisions of Cooper Industries known as Arrowhart, Funk, and Martin Decker (hereafter, such equipment will be referred to as "the Arrowhart equipment," "the Funk equipment," and "the Martin Decker equipment," respectively). The Arrowhart equipment consisted of a model 4341 K01 central processing unit and assorted peripheral equipment. The Funk equipment consisted of a model 4341 L01 central processing unit and assorted peripheral equipment. The Martin Decker equipment consisted of a model 4341 L02 central processing unit and assorted peripheral equipment. On April 29, 1983, CIS purchased from IBM computer equipment for a price of $ 1,531,515. By a lease agreement and amendments thereto dated March 3, 1983, and April 9, 1983, respectively, *256 CIS leased that equipment to Goulds Pumps, Inc. (hereafter, the equipment leased to Goulds Pumps, Inc., will be referred to as "the Goulds Pumps equipment"). The Goulds Pumps equipment consisted of a model 3083 E16 central processing unit and assorted peripheral equipment. In sum, between September 9, 1982, and April 29, 1983, CIS made three separate purchases of IBM computer equipment for an aggregate price of $ 2,935,143 and leased the equipment to various users (hereafter, the purchased IBM computer equipment will be referred to in the aggregate as "the equipment" and the users leasing the equipment from CIS will be referred to as "the end users"). CIS paid for the AT&T equipment by paying $ 56,359 in cash and borrowing $ 256,087 on a nonrecourse basis and $ 43,340 on a recourse basis from Lincoln/Leaseway. CIS paid for the Arrowhart, Funk, and Martin Decker equipment by paying $ 147,963 in cash and borrowing $ 899,879 on a nonrecourse basis from NSCC. CIS paid for the Goulds Pumps equipment by obtaining a $ 1,531,515 "bridge loan" from Wells Fargo and refinancing that loan with a $ 1,686,976.16 loan from Lincoln/Leaseway. The record does not reflect whether that debt was recourse *257 or nonrecourse (hereafter, all of the foregoing loans will be referred to collectively as "the bank liens"). Purchase by Program- *868 Pursuant to a "Purchase Agreement" dated October 31, 1983, Program Leasing Corporation ("Program") purchased the equipment from CIS for a price of $ 3,030,300. Program purchased the equipment subject to the bank liens and subject to the lease rights of the end users. Program agreed to pay $ 180,000 in cash on the date of the Purchase Agreement, and the balance of the purchase price, $ 2,850,300, was to be represented by a "Full Recourse Installment Promissory Note," bearing interest at 6.937 percent through December 31, 1985, and 11 percent thereafter until paid ("the Program note"). The Program note becomes due in all events on October 31, 1998. In the event, however, that Program receives certain proceeds from its subsequent sale of the equipment, Program is obligated to make certain prepayments to CIS. Specifically, Program must pay CIS $ 248,300 on the date of the Purchase Agreement as prepaid interest, monthly interest payments of $ 6,927.75 per month from November 1, 1983, through December 31, 1985, and monthly installments of principal and interest *258 of $ 63,578.86 until October 31, 1990. Purchase by LEA- Pursuant to a "Purchase Agreement" dated October 31, 1983, Program sold the equipment to The Leasing Equipment Associates-1983 Limited Partnership ("LEA"), subject to the bank liens and the lease rights of the end users. LEA agreed to pay $ 3,030,300 for the equipment. Of this amount, $ 79,200 was payable in cash on the date of the Purchase Agreement, $ 100,800 was to be represented by a nominally recourse note due on January 31, 1985 ("the short-term note"), and the balance of the purchase price, $ 2,850,300, was to be represented by a "Partial Recourse Secured Promissory Note," that bears 11-percent interest ("the partial recourse note"). The partial recourse note is payable in all events on October 31, 1998. In the event, however, that LEA receives fixed rent payments pursuant to its subsequent lease of the equipment, LEA is obligated to make certain prepayments to Program. Specifically, LEA agreed to pay $ 38,400 on the date of the Purchase Agreement as prepaid interest. LEA agreed to deliver two nominally recourse promissory notes in the amounts of $ 230,400 each and due on April 30, 1984, and January 31, 1985, respectively *259 ("the prepaid interest notes"). Payments pursuant to those notes were to represent prepaid interest. LEA agreed to make monthly interest payments of $ 6,927.75 from November 1983 through December 1985 and monthly installments of principal and interest of $ 63,578.86 thereafter until October 31, 1990. The partial recourse note limits LEA's recourse liability to $ 1,818,182 plus the amounts owed pursuant to the short-term note and prepaid interest notes, or, if less, the unpaid balance of the partial recourse note. As security for its obligations to Program, LEA granted Program a "purchase money security interest" encumbering, among other assets, the equipment, all leases of the equipment, and "all proceeds." Section 3.2 of the Purchase Agreement between LEA and Program provides as follows: Discharge of Lien. Seller [Program] shall cause the User Lessor [CIS] to (i) fully pay and perform any and all of its obligations (to the extent such obligations are recourse obligations) under the Lien when due and (ii) not materially modify the terms of the Lien in any way to extend or in any way alter its payment terms except as permitted under Section 4.1 hereof. "Lien" refers to the bank liens. *260 The Leaseback- Pursuant to an "Agreement of Lease" dated October 31, 1983, LEA leased the equipment back to CIS, subject to the bank liens, the lease rights of the end users, and Program's security interest [2] ("the lease"). The lease provides for a term expiring on October 31, 1990. The Agreement of Lease provides for fixed rent of $ 6,927.75 per month through December 1985, and $ 63,578.86 per month thereafter through October 1990. The Agreement of Lease also entitles LEA to a portion of the rent to be received by CIS from end users ("shared rent"). Specifically, LEA became entitled to 25 percent of the "adjusted gross rents" derived from the AT&T equipment after the bank lien against the AT&T equipment had been satisfied and through December 31, 1987. Moreover, the Agreement of Lease entitles LEA to 60 percent of the "adjusted gross rents" derived from all of the equipment after January 1, 1988, and through the remainder of the lease term. The Agreement of Lease defines "adjusted gross rents" as the amounts paid by end users, less storage and refurbishing costs associated with the releasing of the equipment. Continental *261 Information Systems, CIS' parent, guaranteed CIS' rent obligation to LEA. By letter dated October 31, 1983, LEA directed CIS to pay fixed rent payments due under the lease directly to Program pursuant to the partial recourse note. By letter of the same date, Program directed CIS to apply the foregoing payments against the installments due under the Program note. According to the Agreement of Lease, the lease to CIS was a "net lease," meaning that CIS, as lessee, was to be responsible for "all costs and expenses of any nature whatsoever arising out of or related to or in connection with this Lease or the Equipment." The chart appearing at the end of this opinion illustrates the sale and leaseback transaction described above. Economic Consequences- At termination of the lease, if LEA has failed to receive any shared rent and the equipment lacks any residual value that LEA might realize through some disposition of the equipment, then the sale and leaseback transaction will result in a negative cash flow of over $ 679,200 for LEA. That figure is the sum of the payments that LEA must make to Program that are not matched by rent payments from CIS pursuant to the lease. Such payments are *262 described as follows: *869 Cash downpayment
$ 79,200
Short-term note
$ 100,800
Prepaid interest
$ 38,400
Prepaid interest note
$ 230,400
Prepaid interest note
$ 230,400
Total
[3] $ 679,200
Petitioner's [4] Investment Pursuant to a "Subscription Agreement" dated October 14, 1983, petitioner purchased .917 of a unit interest in LEA. Because each unit represented an 8.25-percent interest in the partnership, petitioner acquired a 7.57-percent interest in the partnership (.917 X .0825). Petitioner paid $ 12,000 *263 in cash and, in addition, delivered two promissory notes in the amounts of $ 17,600 and $ 25,300, due on April 30, 1984, and January 31, 1985, respectively. Of the cash payment, approximately $ 2,292.50 (.917 X $ 2,500) represented petitioner's contribution towards legal, accounting, and appraisal costs associated with the sale and leaseback transaction. Principal and interest on the two notes equalled $ 18,653.11 and $ 29,109.56, respectively. Thus, petitioner's cash investment in the transaction totalled $ 59,762.67 ($ 12,000 + $ 18,653.11 + $ 29,109.56). In addition, petitioner signed an "Assumption Agreement." Pursuant to the Assumption Agreement, petitioner "assumes and promises to pay" his pro rata share of LEA's indebtedness to Program pursuant to the partial recourse note, to the extent such amount does not exceed $ 137,550, "plus interest on such amount." Petitioner agreed that in the event Program made a claim against LEA pursuant to the partial recourse promissory note, LEA's general partner would be entitled to require petitioner to make an additional capital contribution "on a pro-rata basis to provide the money necessary to satisfy such claim." The Assumption Agreement *264 also contains the following language: 7. It is further understood and agreed that the undersigned's obligation hereunder shall be a primary obligation of the undersigned, and that the undersigned shall have no right of indemnification or contribution from, or subrogation against, the Debtor [LEA], the general partner thereof or any other person, it being the intention and understanding of the undersigned that, to the extent of the undersigned's liability hereunder, the undersigned shall bear his portion of the ultimate risk of loss. The "Amended and Restated Limited Partnership Agreement of The Equipment Leasing Associates-1983 Limited Partnership" (LEA was formerly known as The Equipment Leasing Associates) dated November 4, 1983 ("the partnership agreement"), provides as follows: The General Partner and the Limited Partner hereby agree that they shall be severally (and not jointly) liable to the Partnership for their proportionate share (based upon their percentage interest and hereinafter called a "Share") of the amount of the Indebtedness from time to time outstanding as to which the Partnership then has full-recourse liability. In its Federal income tax return for 1983, LEA elected *265 pursuant to section 761(a) to be wholly excluded from the provisions of subchapter K of the Internal Revenue Code, which govern partnership taxation. The partnership agreement contains a paragraph wherein each of the partners consents to the election. Another provision of the partnership agreement confers upon each partner the right to withdraw from the partnership and receive in exchange for his interest therein a "pro-rata undivided interest in all assets owned by the Partnership at the time of such withdrawal." In addition, the general partner is denied the authority to "sell or otherwise dispose of the Partnership's Equipment, without the written consent of all Limited Partners." OPINION I. ECONOMIC SUBSTANCE Respondent contends that the sale and leaseback transaction should not be respected for Federal income tax purposes because it lacks economic substance. In general terms, a transaction has economic substance and therefore will be respected for Federal income tax purposes if it is "imbued with tax-independent considerations." Frank Lyon Co. v. Commissioner, 435 U.S. 561, 584-585 (1978); Hulter v. Commissioner, 91 T.C. 371, 388 (1988). That a transaction is shaped in part, *266 however, by tax considerations is no reason for disregarding its form. Frank Lyon Co. v. Commissioner, supra at 581. Levy v. Commissioner, 91 T.C. 838, 853 (1988). A sale and leaseback transaction involving computer *870 equipment, for example, will be respected if it is either motivated by "business purpose" or possesses "economic substance," i.e., "a reasonable opportunity of producing a profit, exclusive of tax benefits." Levy v. Commissioner, supra at 853-854; accord Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 203 (1983), affd. in part 752 F.2d 89 (4th Cir. 1985). Whether a transaction has business purpose or economic substance are issues of fact ( Levy v. Commissioner, supra at 854), and petitioners bear the burden of proof. Rule 142(a). We conclude that petitioners have met that burden. Specifically, petitioners have demonstrated that the sale and leaseback transaction has economic substance because it has "a reasonable opportunity of producing a profit." In order to produce a pretax profit, LEA must realize shared rent and residual value in excess of $ 742,704, the amount of its negative cash flow from the sale and leaseback transaction. At trial, experts for petitioners *267 and respondent agreed that LEA purchased the equipment at a price approximating fair market value. The experts disagreed, however, on the amount of shared rent and residual value that could be expected by LEA. Prior to discussing each expert's individual report, it is helpful to summarize some of the major developments in the history of IBM computer equipment. The reports of all of the experts disclose that anticipated technological advancement by IBM was a major if not the most significant factor affecting the projected residual values of computer equipment, and the history of such technological advancement is some indication of the pace of change. In 1964, IBM introduced into the marketplace the model 360 "family" of central processing units as a replacement for the model 1400 family. In 1970, IBM first announced the model 370 family of central processing units. In 1977, the model 303X "series" of central processing units was announced. Those units were designed to accommodate those users needing larger computers. The units, therefore, did not directly compete with the smaller members of the model 370 family. In January 1979, however, IBM announced the model 4300 family of central *268 processing units, and the introduction of those units into the marketplace had a very negative impact on mid-size units belonging to the model 370 family. In 1980, IBM announced the model 308X series of central processing units. The model 3083 central processing unit was announced by IBM in 1982 and deliveries began in 1983. [5]
We begin our discussion of the expert's reports by referring to that of The American Appraisal Company. In a report attached to the offering memorandum for LEA, The American Appraisal Company projects residual values for configurations of the equipment equal to 11 to 19 percent of the configurations' fair market values on the date of the appraisal, June 15, 1983. Furthermore, according to the report, the equipment will remain useful for at least nine years after the date of the appraisal. The report observes: "Our investigation indicates that the group of assorted computer-related equipment consists of late 1981 through 1983 IBM equipment." The offering memorandum contains a letter dated July 18, 1983, from International Data Corporation *269 ("IDC") to Continental Information Systems. The letter explains the relationship between future residual value and end user rent by stating that "It is reasonable to assume that monthly lease prices of not less than 7% of the then current fair market value can be readily obtainable for lease terms of one year." The offering memorandum also contains financial projections prepared by Alexander Grant and Company ("Alexander Grant") which assume that LEA will realize shared rent of $ 576,000 and residual value of $ 303,030. Those projections thus are based on the assumption that the residual value of the equipment, in the aggregate, will equal 10 percent of its purchase price of $ 3,030,300. Accordingly, Alexander Grant's assumptions are more conservative than the projections contained in the report of The American Appraisal Company (residual values of 11 to 19 percent for various configurations of the equipment). Mr. Mortimer Wimpie, one of petitioners' experts, submitted a report which characterizes as "reasonable" the projections of Alexander Grant. According to Mr. Wimpie, both the model 1400 central processing units and the model 360 units retained residual values of 20 to 25 *270 percent after nine years on the market. The model 3033 units, according to Mr. Wimpie, retained the same residual values after six years. Regarding the prospects for technological advancement which would destroy the residual values of the equipment (consisting of three model 4341 units, one model 3083 unit, and peripherals), Mr. Wimpie states, "What could be anticipated was refinement of the existing 43XX and 308X technologies and capabilities." *871 Mr. Martin Karnoff, another of petitioners' experts, expressed approval of the shared rent and residual value projections contained in the reports of The American Appraisal Company, IDC, and Alexander Grant. In his report, Mr. Karnoff states, "This witness can find no fact or circumstance available in October, 1983, which would open to question the positions taken by any of these three organizations." Mr. Karnoff notes that model 3033 central processing units, first delivered in 1977, retained a residual value of between 24 and 27 percent in October 1983 according to the Computer Price Guide published by Computer Merchants, Inc., and commonly referred to as "the Blue Book." [6] Mr. Karnoff also notes, "The IBM 3083, Model E, which comprises *271 approximately half of the value of the equipment which is the subject of this opinion, was announced by IBM during 1982, with deliveries commencing in 1983" and that with respect to the peripherals "there was every indication that they would realize useful economic lives in excess of seven additional years." Petitioners also submitted a report prepared by Mr. Esmond C. Lyons. Mr. Lyons projects shared rent of $ 515,710 to $ 624,655 and residual value of $ 79,874 to $ 536,337. Mr. Lyons primarily relied upon a depreciation curve prepared by the Stanford Research Institute and known commonly as "the SRI curve." Of the curve, Mr. Lyons comments, "As history has confirmed, at different times the specific values for specific products were either above or below the indicated curve, but the basic shape of the curves remained impressively valid." According to Mr. Lyons' report, "The sharable-revenues were derived by comparing the differences in residual values over the period of revenue-sharing, and calculating the reasonable anticipated *272 rent, less any applicable remarketing expenses." Respondent submitted a report prepared by the American Technology Appraisal Service ("ATAS"). The report places the value of the equipment on October 31, 1983, at $ 2,674,101, or 78 percent of list price, and projects descending residual values for the equipment, estimating that the residual value of the equipment in October 1989, one year before expiration of the lease, will be only $ 627, or two percent of list price. At trial, however, one of the authors of the report, Mr. Paul Blumenthal, conceded that the report ignored one model 4341 central processing unit included in the equipment and that once that unit is taken into account, LEA purchased the equipment at fair market value. Furthermore, a written amendment to the ATAS report forecasts a residual value of $ 928 in October 1989. The report does not predict what, if any, residual value the equipment will have upon expiration of the lease in October 1990. Moreover, the report does not provide a forecast of the shared rent which LEA can expect from the transaction. The ATAS report observes that the model 4341 central processing unit was impacted severely by the introduction into *273 the marketplace, in September 1983, of the models 4361 and 4381 units. According to the report, in October 1983, the model 4341 units could demand no more than 67 percent of list price on the used computer market. Editorial comments appearing in the October 1983 edition of the Blue Book confirm that assessment. The ATAS report acknowledges that the model 3083 processor was not impacted similarly and opines that it could demand 100 percent of list price in October 1983. The experts' projected residual values and shared rents can be summarized as follows: Expert
Residual Value Shared Rent
Wimpie
$ 303,030 $ 576,000
Karnoff
$ 303,030 $ 576,000 *
Lyons
$ 79,874-$ 536,337 $ 515,710-$ 624,655
Blumenthal
$ 928 ** no opinion
We find that the assumptions contained in the report prepared by Alexander Grant are reasonable and that the sale and leaseback transaction *274 therefore presented a reasonable opportunity for pretax profit. Those assumptions are within the ranges of forecast residual value and shared rent reported by Mr. Lyons, who relied upon the SRI curve in making his forecasts. We previously have recognized use of the SRI curve as an acceptable methodology for predicting future values. E.g., Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 205. [7] Further, we view the assumptions as reasonable (and the forecasts of respondent's expert as *872 unreasonable) given the fact that most of the equipment was relatively new. Given the history of other IBM central processing units and the fact that peripheral equipment retains residual value better than processors because it often can be used with different processors, we find unreasonable ATAS's projection of a two-percent residual value for the equipment after the first six years of a seven-year lease. The ATAS report states, "It is ATAS's opinion that there was a lack of sufficient data to project any rate of profitability with any degree of accuracy. ATAS believes that the execution of a proper due diligence investigation would have *275 recognized this and would have indicated the need for an extensive additional investigation." The problem with the ATAS statement is that a completely accurate prediction of future residual value is impossible. All of the experts, including Mr. Blumenthal, agreed that projecting future values involves some element of conjecture. The ATAS report notes that the residual values of model 4341 central processing units were impacted negatively by the introduction of replacements prior to the LEA purchase. Mr. Wimpie, however, acknowledged such negative impact and Mr. Lyons' projections of residual values for the model 4341 units appear to take that factor into account (residual values of 0 to 5 percent of list price in October 1990 and 5 to 20 percent of list price in October 1987). Furthermore, we do not believe that introduction of the model 4341 units in 1979 to the detriment of values for some model 370 units should be interpreted as proof of accelerating technological advancement that will destroy the residual value of the equipment. IBM introduced the model 4341 units in response to a threat to its share of the market for midsize computers. Larsen v. Commissioner, 89 T.C. 1229, 1246 (1987). *276 The record discloses that the introduction of the model 4341 units was an isolated development in response to a particular situation and not indicative of a future trend. The ATAS report also criticizes IDC's statement that rent equal to seven percent of the equipment's fair market value could be expected on one-year end-user leases. The report notes that the end-user lease with AT&T provides for a lower rate (2.7 percent "lease factor" used to calculate monthly rent). We note that the AT&T lease is a lease providing for an initial term of three years, with renewal options. Thus, the lease factor used in that lease does not cast doubt on the IDC statement regarding one-year leases. Moreover, our finding that the sale and leaseback transaction presented a reasonable opportunity for profit does not depend upon a seven-percent lease factor. We already have found that LEA can expect residual value at the end of the lease term of $ 303,030. Accordingly, LEA needs shared rent of $ 439,674 ($ 742,704 less $ 303,030) in order to "break even." The American Appraisal Company report forecasts residual values for configurations of the equipment at the end of 1987 (after which rent sharing commences) *277 in the range of 29 to 43 percent of the equipment's purchase price. Taking the lowest percentage, 29 percent, and multiplying it by the purchase price, $ 3,030,300, results in an interim residual value of $ 878,787 at the commencement of rent sharing. LEA became entitled to 60 percent of the end-user rent generated by the equipment, after the deduction of certain marketing costs. A lease factor of 3.5 percent thus would result in $ 221,454 of shared rent after only one year ($ 878,787 X .035 X 12 X .60). In the second year of rent sharing, assuming an interim residual value of 18 percent of the purchase price (again, the lowest percentage given by The American Appraisal Company), additional shared rent of $ 137,454 could be expected (.18 X $ 3,030,300 X .035 X 12 X .60). In the third year of rent sharing, using an interim residual value of 14 percent (again, the lowest percentage given by The American Appraisal Company), we calculate shared rent of $ 89,091 in ten months (.14 X $ 3,030,300 X .035 X 10 X .60). Accordingly, our calculations disclose that a 3.5-percent lease factor would permit LEA to make a pre-tax profit, as it would receive shared rent of $ 447,999 ($ 221,454 *278 + $ 137,454 + $ 89,091). Finally, the ATAS report attempts to discredit the American Appraisal Company projections by extrapolating the residual value of the Goulds Pumps equipment from a provision in the Goulds Pumps end-user lease which permitted Goulds Pumps to terminate that lease after 24 months by paying CIS the amount by which the sum of future rent payments exceeds the present value of rents payable pursuant to a re-lease of the Goulds Pumps equipment. The provision supplies an interest rate for calculating that present value, and ATAS applied that discount rate to rent payments due from Goulds Pumps to arrive at an interim residual value after 24 months (on 5/1/85). We reject the ATAS approach to predicting residual value because it has not been established, to our satisfaction, that the value of computer equipment on a given date equals simply the present value of rent payments to be received from a lease of the equipment or even that the discount rate provided in the Goulds Pumps lease represents a fair allowance for the use of money. In sum, we conclude that the sale and leaseback transaction presents a reasonable opportunity for profit and that therefore the transaction *279 should be respected for Federal income tax purposes. *873 We note that a "reasonable" opportunity for profit entitles the transaction to recognition and that future profit need not be certain. Gefen v. Commissioner, 87 T.C. 1471, 1492 (1986). Because we find that the sale and leaseback transaction has economic substance, we do not address whether or not the transaction was motivated by business purpose. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 203. II. BENEFITS AND BURDENS OF OWNERSHIP Respondent next argues that petitioner is not entitled to deductions attributable to the sale and leaseback transaction because no sale of the equipment to LEA took place. A sale will not be respected for Federal income tax purposes unless the benefits and burdens of ownership have been transferred. Levy v. Commissioner, 91 T.C. at 89-860. Moreover, that a sale and leaseback transaction has economic substance does not mean necessarily that the benefits and burdens of ownership have been transferred. Larsen v. Commissioner, 89 T.C. at 1266. Whether the benefits and burdens of ownership have been transferred is an issue of fact to be decided according to the intentions of the contracting *280 parties as disclosed by their agreements, which are to be interpreted in light of all relevant facts and circumstances. Levy v. Commissioner, supra at 860. Petitioners bear the burden of proof. Rule 142(a). The following circumstances generally do not bear upon whether the benefits and burdens of ownership have been transferred in a sale and leaseback transaction: (1) the use of a net lease, (2) the absence of significant positive cash flow to the owner/lessor during the lease term because of matching installments due pursuant to a purchase money note, and (3) the use of nonrecourse financing. Larsen v. Commissioner, supra at 1267. The following considerations, however, are relevant to the issue of whether the benefits and burdens of ownership have been transferred in a sale and leaseback transaction: (1) the equity acquired in the property as a percentage of its purchase price, (2) whether the useful life of the property extends beyond the lease term, (3) whether lease renewal or purchase options at the end of the lease term are based upon the property's fair market value at that time, (4) whether the owner/lessor will recover his investment in the property through projected residual *281 value and positive cash flow during the lease term, (5) whether at some point income from the lease will surpass depreciation and interest deductions attributable to the transaction, (6) whether or not the tax savings from the transaction are less than the owner/lessor's initial cash investment, and (7) whether the owner/lessor has the potential for profit or loss from a re-lease or sale of the property. Levy v. Commissioner, supra at 860. With the foregoing considerations in mind, we find that the sale and leaseback transaction did transfer the benefits and burdens of owning the equipment to LEA. Respecting the first consideration, LEA paid roughly six percent of the equipment's purchase price ($ 180,000 divided by $ 3,030,300) in cash and the short-term note. There is no dispute that LEA purchased the equipment for a price equal to its fair market value and we therefore find that LEA acquired some equity in the equipment. Respecting the second, fourth, and seventh considerations, we already have found that the useful life of the equipment reasonably could be expected to exceed the lease term and that LEA reasonably could expect to recover its investment and make a profit by realizing *282 shared rent and residual value. If, however, the offering memorandum's projections of shared rent and residual value prove too optimistic, it will be LEA, as owner of the equipment, that suffers a loss. Respecting the third consideration, the Agreement of Lease contains no provision for renewal of the lease term or purchase by the lessee. Respecting the fifth consideration, the projections of Alexander Grant, which we have found to be reasonable, predict that income from the lease will surpass deductions attributable to the sale and leaseback transaction beginning in 1988. Finally, with respect to the sixth consideration, the projections of Alexander Grant show that a limited partner with a one-unit interest in LEA (partially financed) would realize aggregate tax savings of approximately $ 22,700 from the sale and leaseback transaction if tax savings from the initial years of the transaction were invested in a "sinking fund" paying seven-percent interest. Meanwhile, the cost of one unit was $ 57,500. In sum, we conclude that the sale and leaseback transaction did transfer the benefits and burdens of owning the equipment to LEA. III. PROFIT OBJECTIVE While deductibility of the *283 interest deductions generated by the sale and leaseback transaction having economic substance does not depend upon a profit objective (sections 163(a), 183(b)(1)), depreciation deductions must be attributable to property used in a trade or business or held for the production of income. Sec. 167(a). In addition, other, miscellaneous deductions generated by the transaction must be attributable to a trade or business, the production or collection of income, or the management, conservation, or maintenance of property held for the production of income. Secs. 162(a), 212(1) and (2). Petitioners' entitlement to depreciation and these other deductions depends upon the presence of profit objective. *874 The instant case is appealable to the Sixth Circuit Court of Appeals. That court has articulated the requirement of profit objective as follows: "The threshold inquiry in determining whether an activity is a trade or business or is carried on for the production of income is whether the activity is engaged in for the primary purpose and dominant hope and intent of realizing a profit." Hayden v. Commissioner, 889 F.2d 1548, 1552 (6th Cir. 1989), affg. a Memorandum Opinion of this Court. Section *284 183 governs activities not described in sections 162(a) or 212(1) or (2). Sec. 183(c). In Levy v. Commissioner, supra at 871, we held that an activity is governed by section 183 unless it is engaged in with an "actual and honest objective of making a profit." If the Sixth Circuit and this Court have differing profit objective standards, the difference is inconsequential in the instant case. Section 183 can hardly be called a disallowance provision, because it permits deductions not otherwise allowed by sections 162(a), 167(a), or 212(1) or (2). Brannen v. Commissioner, 78 T.C. 471, 500 (1982), affd. 722 F.2d 695 (11th Cir. 1984). First, section 183(b)(1) permits those deductions allowable regardless of profit objective, e.g., interest and State and local taxes. Second, section 183(b)(2) additionally permits those deductions which would have been allowable if the activity had been engaged in for profit, e.g. , depreciation, but only to the extent that gross income from the activity exceeds the deductions allowed by section 183(b)(1). The existence of the requisite profit objective is an issue of fact, and petitioners bear the burden of proof. Flowers v. Commissioner, 80 T.C. 914, 931-932 (1983); *285 Rule 142(a). As a general rule, we determine the existence of a profit objective at the partnership level. Brannen v. Commissioner, supra at 505; Hager v. Commissioner, 76 T.C. 759, 782 n.11 (1981). Analyzing the sale and leaseback transaction at the partnership level, we conclude that the requisite profit objective was present. Our conclusion is based on a number of circumstances. First, LEA purchased the equipment for a price equal to its then fair market value, which respondent's expert concedes and which is further corroborated by Program's purchase of the equipment from CIS in an arm's-length sale between unrelated parties for the same price paid by LEA. Thus, we are not confronted with a situation in which a partnership, through the use of nonrecourse financing, improperly has inflated the purchase price of an asset in order to take advantage of depreciation deductions or investment tax credit. Under circumstances where such improper inflation is present, tax avoidance or some other nonprofit objective is the concern of the transaction. [8]
Second, LEA purchased the equipment while in possession of reports by The American *286 Appraisal Company, IDC, and Alexander Grant which project future profit. Those reports are plausible because the great majority of the equipment consisted of relatively new processors and peripherals that could be expected to produce income through the term of the lease and beyond. Mr. Mark J. Lane, the general partner of LEA, reviewed the reports and noted that one-half of the equipment's value was attributable to an absolutely new processor, the model 3083. Mr. Lane also noted that the reports were consistent with other reports of projected residual value that he had reviewed and that the Alexander Grant report projected a profit even though it used assumptions less optimistic than those set forth in the report of The American Appraisal Company. [9] *287 IV. AT-RISK RULES Respondent contends that section 465 limits the extent to which petitioners may deduct losses from the sale and leaseback transaction. Specifically, respondent contends that petitioners may not deduct losses exceeding petitioners' cash contributions to LEA, because petitioner's "amounts at risk" for the years in issue do not include his pro rata share of LEA's liability to Program pursuant to the partial recourse note. Petitioners bear the burden of proof on the at-risk issue. Rule 142(a). Section 465(a)(1) provides that losses from certain activities are deductible only to the extent that the taxpayer is "at risk" with respect to each activity "at the close of the taxable year." Losses disallowed pursuant to section 465(a)(1) are carried forward and *875 allowed as losses *288 in succeeding taxable years if and when the at-risk rules are satisfied. Sec. 465(a)(2). A taxpayer's amount at risk includes the amount of money and the bases of property contributed to an activity. Sec. 465(b)(1)(A). The amount at risk also includes "amounts borrowed with respect to such activity." Sec. 465(b)(1)(B). The statute defines amounts borrowed with respect to an activity as including "amounts borrowed for use in an activity to the extent that * * * [the taxpayer] is personally liable for the repayment of such amounts." Sec. 465(b)(2)(A). Notwithstanding the foregoing provisions, a taxpayer's amount at risk does not include "amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Sec. 465(b)(4). Respondent cites section 465(b)(4) as support for his argument that petitioner's amounts at risk do not include his assumed pro rata share of the partial recourse note. [10] In Levy v. Commissioner, 91 T.C. at 869, we stated that the issue of whether section 465(b)(4) limits a taxpayer's amount at risk "must be resolved on the basis of who realistically will be the payor of last resort if the transaction goes *289 sour and the secured property associated with the transaction is not adequate to pay off the debt." Legislative history indicates that section 4155(b)(4) addresses arrangements which effectively immunize a taxpayer from any realistic possibility of loss by providing "compensation or reimbursement." According to the Senate Report to the Tax Reform Act of 1976, A taxpayer's capital is not "at risk" in the business, even as to the equity capital which he has contributed to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not "at risk" if he arranges to receive insurance or other compensation for an economic loss after the loss is sustained, or if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement between himself and another person. *290 S. Rept. No. 94-938, 1976-3 (Vol. 3) C.B. 49, 87 (emphasis supplied; fn. ref. omitted). The report provides examples of arrangements covered by section 465(b)(4). It mentions "stop loss" orders pursuant to which commercial feedlots agree to reimburse investors for losses on livestock sales. It mentions agreements requiring limited partnerships engaged in livestock breeding to repurchase, for a minimum price, a partner's interest at the partner's election. The report states that a partner in such a partnership is protected against loss to the extent of the guaranteed repurchase price. The report also mentions insurance which will compensate an investor for payments required to be made pursuant to a recourse liability. The view that section 465(b)(4) addresses arrangements providing compensation or reimbursement is addressed by proposed regulations. See sec. 1.465-6(e), Examples (1) and (4), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979). Respondent points to a number of circumstances as support for his position that petitioner is "protected against loss." First, respondent correctly notes that LEA's monthly installments pursuant to the partial recourse note equal *291 exactly the rent payments due from CIS pursuant to the lease. We reject, however, respondent's argument that such equality of payments constitutes an arrangement protecting petitioner from loss. Recently, in Krause v. Commissioner, 92 T.C. 1003, 1024 (1989), we stated, "As stated, it is the obligor of last resort that is to be regarded as at risk under section 465. The fact that funds may be available from other sources to make payment on debt obligations does not detract from the liability of the debtor of last resort to make such payment if the funds are not forthcoming." In the instant case, petitioner and the other members of LEA are the obligors of last resort with respect to the partial recourse note. The fact that the partial recourse note might be amortized by lease payments from CIS, and that the partial recourse note might be satisfied in whole or in part through offsetting accounting entries rather than actual cash payments does not in and of itself change this fact. Gefen v. Commissioner, 87 T.C. at 1503. [11]
Respondent notes that the partial recourse note, absent any prepayment obligation, will not become *292 due until 1998. The fact that a liability does not become due until some future date, however, does not remove the liability from a taxpayer's amount at risk. Respondent cites Bussing v. Commissioner, 88 T.C. 449 (1987), supplemental opinion 89 T.C. 1050 (1987), but in that case we stated, "Considered in the context of the lack of substance of Sutton's [payee's] role and the parties' *876 disregard of the form of the transaction, the existence of the deferral provision reinforces our conclusion that Bussing's indebtedness to Sutton is without substance." 89 T.C. at 1057. In Bussing, we rested our conclusion that the debt involved was illusory upon a number of considerations, including the fact that the parties involved in the transaction themselves disregarded the terms of the debt. 89 T.C. at 1056-1057. Respondent notes that CIS' corporate parent, Continental Information Systems, guaranteed CIS' obligation to pay rent to LEA. The guarantee, however, does not protect petitioner from ultimate liability for his pro rata share of the partial recourse note. Rather, the guarantee merely diminishes the possibility that LEA will be unable to collect the rent to which it is entitled under *293 the lease. LEA remains the debtor of last resort with respect to the partial recourse note. In our precedents, we have cited such guarantees, in conjunction with other factors, as indicative of a lack of ultimate liability. However, a rental guarantee, such as that involved in the instant case, by itself does not constitute protection against loss. [12]
Respondent claims that section 3.2 of the Purchase Agreement between LEA and Program provides petitioner with protection against loss. Section 3.2, however, at most requires Program to indemnify LEA should CIS fail to pay the bank liens. Most importantly, the provision does not entitle LEA, petitioner, or any other LEA partner to indemnification for losses due to enforcement of the partial recourse note. Moreover, *294 the provision does not give LEA a claim against Program should CIS stop paying LEA rent pursuant to the lease. Thus, the provision does not confer on LEA an "offsetting claim" which petitioner could assert in the event Program sought to enforce the partial recourse note. We recognize that Larsen v. Commissioner, 89 T.C. 1229 (1987), involved a similar provision. In that case, the taxpayer assumed an obligation secured by the computer equipment which he had purchased and claimed to be at risk to the extent of the assumed liability. Purchase agreements, however, entitled the taxpayer to indemnification from the seller in the event the seller failed to pay the secured obligations. 89 T.C. at 1273-1274. In that case the taxpayer was not the obligor of last resort with respect to the assumed liability. The seller was the primary obligor. In the instant case, by contrast, no party has agreed to reimburse petitioner for losses sustained because of his assumption of a pro rata share of the partial recourse note. Respondent points out that because CIS' rent payments are applied first against LEA's obligation to Program pursuant to the partial recourse note and then to Program's obligation *295 to CIS, default by CIS means only that CIS will stop paying itself. Implicit in respondent's argument is the suggestion that a default by CIS in its obligation to pay rent would be inconsequential. We do not agree. In the worst-case scenario we must assume for purposes of our analysis ( Melvin v. Commissioner, 88 T.C. 63, 75 (1987), affd. 844 F.2d 1072 (9th Cir. 1990)), CIS would fail to pay LEA rent due pursuant to the lease. CIS, for example, could become bankrupt and reject the lease, thereby giving LEA a claim for damages ("the benefit of the bargain") but depriving it of monthly rent. 11 U.S.C. sec. 365(a) (1982); In re White Motor Corp., 44 Bankr. 563 (N.D. Ohio 1984). The partners of LEA then would be required to pay Program the balance of the partial recourse note on October 31, 1988 (as prepayment is required only so long as LEA receives rent from CIS). Finally, respondent contends that petitioner is protected against loss because "various indemnification provisions" would give LEA "an offsetting claim against Program and CIS" in the event Program attempted to enforce the partial recourse promissory note. We already have addressed the effect of section 3.2 of the Purchase *296 Agreement between Program and LEA. We are unaware of any other indemnification provision bearing upon petitioner's ultimate liability and respondent does not explain his reference. Because of our holdings, we need not address the applicability of the additions determined by respondent. In order to reflect the foregoing, Decision will be entered for the petitioners. *877 [SEE ILLUSTRATION IN ORIGINAL] Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on $ 3,752. ↩
**. 50 percent of the interest due on $ 21,566.14 ↩
2. CIS, apparently, did not obtain a security interest from Program.↩
3. The reason that LEA's negative cash flow will exceed $ 679,200 is that the short-term note and the prepaid interest notes each bear interest at 12 percent per year. Our own calculations disclose that LEA's negative cash flow will actually total $ 742,704, as interest of $ 15,120, $ 13,824, and $ 34,560 must be added to the principal amounts of those notes, respectively. Our calculations assume simple, not compound, interest because the notes do not provide for compound interest. Matter of Estate of Jackson, 120 A.D. 2d 309, 508 N.Y.S. 2d 671, 673↩ (the notes provide that they be interpreted according to New York law). 4. Henceforth, "petitioner" shall refer to petitioner George J. Emershaw alone.↩
5. For a general discussion of the history of IBM computer equipment, see Larsen v. Commissioner, 89 T.C. 1229, 1244-1246↩ (1987).
6. We have recognized the Blue Book as an "established, objective source" of computer equipment values. Estate of Cohen v. Commissioner, T.C. Memo. 1988-584↩.
*. Both Mr. Wimpie and Mr. Karnoff essentially endorsed the projections made by Alexander Grant in the offering memorandum for LEA. ** Mr. Blumenthal's written report forecasts a residual value of $ 928 in October 1989 without expressing any opinion on what, if any, value the equipment would have upon expiration of the lease in October 1990.↩
7. Estate of Cohen v. Commissioner, T.C. Memo. 1988-584↩.
8. Estate of Cohen v. Commissioner, T.C. Memo. 1988-584↩.
9. Our conclusion that the sale and leaseback transaction was motivated by the requisite profit objective would be the same if the transaction were examined at petitioner's LEA level, because petitioner purchased his capital interest in LEA at fair market value and based his decision to invest in LEA upon the same information LEA had when it purchased the equipment from Program, i.e., the reports of The American Appraisal Company, IDC, and Alexander Grant. A 7.57-percent interest in projected residual value and shared rent of $ 879,030 ($ 303,030 + $ 576,000) equals $ 66,542.57, an amount well in excess of petitioner's cash investment of $ 59,762.67. Petitioner also was encouraged by the quality of the end users, who he described as "Standard & Poor AA companies" and the fact that all of the equipment was manufactured by IBM.
10. Section 465(b)(3) excludes from a taxpayer's amount at risk amounts borrowed from "any person who has an interest in * * * [the] activity." Respondent conceded, on brief, that section 465(b)(3) does not affect petitioner's amount at risk.↩
11. B & A Distributing Co. v. Commissioner, T.C. Memo. 1988-589↩.
12. In Van Roekel v. Commissioner, T.C. Memo. 1989-74↩, for example, we disregarded an intermediate purchaser of computer equipment because the interposition of that party lacked business purpose. After noting that the party's purchase money liability was nonrecourse, we held that the taxpayer's liability also was nonrecourse in substance. In the instant case, respondent conceded the substance of Program, the intermediate purchaser.